**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>PHILIP MACCANI,<br>a/k/a Phillip Maccani,<br>Defendant. | Case No. 20-cr-90-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

Page

I.     *INTRODUCTION*...............................................................................2

II.    *FINDINGS OF FACT*........................................................................3

III.   *DISCUSSION*..................................................................................10

    A.   *The search warrant did not violate the Fourth Amendment*...............11

        1.   *The Application and Affidavit in Support of the Warrant*.........11

        2.   *Relevant Law*..............................................................13

        3.   *The Parties' Positions*...................................................15

        4.   *Probable Cause*...........................................................15

        5.   *Particularity*...............................................................20

        6.   *Recommendation*..........................................................22

    B.   *The* Leon *good faith exception applies to the warrant*.....................23

1

C.      The automobile exception to the warrant requirement applied to the search of the trailer ....................................................................**25**

D.      Probable cause existed for a warrantless search of the trailer............**34**

E.      The officers had authority to enter the trailer and seize the sawed-off shotgun and ammunition..............................................................**36**

      1.      The incriminating nature of the shotgun was immediately apparent to Deputy Omar......................................................**37**

      2.      Deputy Omar had the right to enter the trailer because he had third-party consent to enter.................................................**39**

      3.      Deputy Omar's entry into the trailer was justified under the community caretaking exception to the warrant requirement.....**45**

F.      If the District Court decides that the warrant was valid, evidence seized under the warrant should not be suppressed, even if the District Court determines that Deputy Omar's entry into the trailer to blow out the candle was unconstitutional ....................................................**46**

G.      None of the evidence seized is fruit of a poisonous tree...................**48**

IV.     CONCLUSION....................................................................................**49**

## I.      INTRODUCTION

On October 21, 2020, the Grand Jury charged Defendant with one count of Possession of an Unregistered Firearm in violation of 26 U.S.C. Section 5861(d).  (Doc. 2.)  The charge arose from an interaction with law enforcement on August 17, 2020.

The matter before the Court is Defendant's Motion to Suppress. (Doc. 30.)  Defendant seeks suppression of evidence seized from his trailer.  Specifically, Defendant seeks suppression of the following:  (1) a Harrington & Richardson 12 gauge Topper

Model 88 modified shotgun, (2) any ammunition that was in the shotgun, (3) three containers with assorted ammunition, and (4) any other ammunition found in the trailer. (Doc. 31 at 15.) Claimant also seeks suppression of measurements of the modified shotgun and photographs of the shotgun and ammunition seized from the trailer. (*Id.*) The Government filed a timely brief in resistance. (Doc. 36.) The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.

I held a hearing on Defendant's motion on December 21, 2020. (Doc. 37.) At the hearing, the Government called three witnesses, Deputies Dylan Schmid, Derek Steines, and Heath Omar, all of the Linn County Sheriff's Office. (*Id.*) Deputy Schmid has been with the Sheriff's Office for 11 years, Deputy Steines has been with the Sheriff's Office for 14 years, and Deputy Omar has been with the Sheriff's Office for 11 years. (Schmid, Steines, & Omar Hr'g Test.)[1] All three deputies have experience working on drug and gun crimes. (*Id.*)

The Government's Exhibits 1-6 and Defendant's Exhibits A-C were admitted without objection. (Doc. 37.) For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

Just before 1:00 a.m. on August 17, 2020, Deputy Dylan Schmid was dispatched to a residence for "subject in the roadway who was causing disturbance."[2] (Schmid Hr'g

---

[1] Citations to hearing testimony are to the Court Reporter's rough draft of the transcript of the December 21, 2020 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

[2] There is a discrepancy between testimony at this hearing and law enforcement body camera video of the events. All questions asked at the hearing were about events that took place on "August 16, 2020" and all witnesses answered regarding events depicted on body camera videos in Government Exhibits 3-6. However, the body camera videos are time-stamped beginning shortly before 1:00 a.m. on August 17, 2020. I therefore find that the events actually occurred

Test.)  Deputy Schmid arrived simultaneously with other law enforcement officers at a cul-de-sac and found a large licensed trailer[3] that appeared to be capable of being pulled behind a motorized vehicle.  The trailer was not attached to such a vehicle, but was parked behind a licensed truck with a trailer hitch suitable for towing it.  (*Id.*; Steines Hr'g Test.; *see also* Gov. Ex. 2 at 8; Def. Ex. A at 2.)  The truck was parked in front of the trailer.  (Schmid Hr'g Test.)  The  trailer hitch rested on a block, wheel chocks blocked the tires, and solar panels leaned against the back of the trailer and were attached to the trailer with electric cables.  (Schmid Hr'g Test.; Omar Hr'g Test.; Def. Ex. A at 1-3; Gov. Ex. 2 at 3. ) The truck and trailer were parked on the public street in front of the lot associated with house number 4120, which was adjacent to the lot associated with house number 4140.  (Schmid Hr'g Test.)  A lawn chair and a large water bottle were on the lawn beside the trailer.  (Schmid Hr'g Test.;  Gov. Ex. 2 at 3.)

Upon arrival, two deputies began walking down the driveway of house 4120, when Deputy Schmid noticed an individual at the threshold of the side door of the trailer.[4] (Schmid Hr'g Test.)  Deputy Schmid told the man, later identified as Defendant, they were responding to a call about a man yelling in the street, and Defendant began a

---

in the early morning hours of August 17, 2020. This discrepancy has no bearing on the credibility of the witnesses, all of whom I find were credible.  I further find I that whether the events took place on August 16 or 17 is not legally relevant to the issues presented in this case.

[3] Deputy Omar estimated the trailer was ten-to-twelve-feet long.  (Omar Hr'g Test.)

[4] The side door to the trailer was located on the right side of the trailer near the front and opened up to the yard associated with house number 4120.  (Gov. Ex. 2 at 4.)  The door was almost as tall as the trailer at that point and was wide enough and wide enough for a person to walk through comfortably.  (*Id.*)  The door opened outward toward the front of the trailer.  (*Id.*)  A bar running parallel to the door along the left side of the door opposite the hinges that could be used to lock the door or as a handrail when entering and leaving the trailer.  (*Id.*.)  Deputy Schmid estimated the trailer sat 20 inches off the ground.  (Schmid Hr'g Test.)  There was no step or stairway to the trailer door.  This door was open at all times relevant to this motion.

4

disjointed and expletive-laden discussion[5] about how angry he was that someone was running a generator while he was trying to play his guitar. (Gov. Ex. 5 at 1:00.) Deputy Schmid ordered Defendant to show both his hands, because his right hand was not visible to Deputy Schmid.[6] (Schmid Hr'g Test.; Gov. Ex. 5 at 1:31.) Defendant refused, stating he had a shotgun in his hand, which Deputy Schmid could not see. (Schmid Hr'g Test.; Steines Hr'g Test.; Gov. Ex. 5 at 1:33-36.) At that point, Deputy Schmid retreated to his patrol vehicle, told his fellow officers to "get cover," and retrieved his rifle from his vehicle. (Schmid Hr'g Test.; Gov. Ex. 5 at 1:45-2:31.) Deputy Derek Steines had arrived on the scene by this time and observed the interchange between Defendant and Deputy Schmid. Deputy Steines saw a shotgun in Defendant's hand "[a]long his side" when Defendant was standing in the doorway of his trailer. (Steines Hr'g Test.) Deputy Steines testified that Deputy Pritchard, who was with Deputy Steines, saw "something small, dark or black or however he put it in the—I believe he said the back pocket" or small of the back of Defendant.[7] (Id.)

After Deputy Schmid retrieved his rifle, he took cover by a patrol vehicle, while Deputy Steines stationed himself behind a tree to speak to Defendant. (Schmid Hr'g

---

[5] Defendant's statements might be fairly characterized as something more dramatic than a mere "discussion." It would be more useful to observe that, having viewed the videotape of Defendant at the scene, I concur with the Deputies' assessments discussed below that Defendant appeared intoxicated.

[6] August 17, 2020 was seven days after a derecho struck this part of Iowa. *See* Bob Hanson, *Iowa Derecho in August was Most Costly Thunderstorm Disaster in U.S. History*, The Washington Post (Aug. 17, 2020), https://www.washingtonpost.com/weather/2020/10/17/iowa-derecho-damage-cost/. The electricity was still out in this neighborhood at the time these facts unfolded and the parties' actions were illuminated only by car headlights and law enforcement flashlights. In spite of this, video of the events is clear. I mention the derecho because Defendant stated that on August 17, he was in town to help his father clean up from the storm.

[7] Deputy Steines later testified that a handgun found in plain view on the threshold of the trailer was "the small handgun that had been previously in the small of [Defendant's] back." (Steines Hr'g Test.)

Test.)  Throughout this time, Defendant remained agitated, continuing his animated discourse.  (Gov. Ex. 5 at 2:48-6:59.)  Deputy Pritchard told Defendant that if he put down the weapon, the officers would go over and talk to Defendant.  (Steines Hr'g Test.)  Deputy Steines saw Defendant retreat out of sight into the trailer and then emerge onto the grass without a gun in his hands.  (*Id.*)  When Deputy Schmid approached Defendant again, he noticed that Defendant did not have a gun in his hand and was standing outside of the trailer.  (Schmid Hr'g Test.; Gov. Ex. 5 at 6:52-7:00.)  Both Deputy Schmid and Deputy Steines testified that Defendant had the time to throw the subsequently discovered shotgun onto a bunk located in the rear of the trailer, a distance of approximately three-to-four feet, and that there was nothing impeding such a throw.  (Schmid Hr'g Test.; Steines Hr'g Test.)  Deputy Omar also testified that it would have been possible to throw a sawed-off shotgun from the door of the trailer to the bunk with one arm.  (Omar Hr'g Test.)

Defendant was intoxicated as evidenced by his admission that he had been drinking, his "highly agitated" behavior, mumbled and slurred speech, thick tongue, argumentative behavior, and illogical conversation.  (Schmid Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.; Gov. Exs. 3, 5.)[8]  In addition, there were empty alcoholic beverage containers in plain view, although the deputies could not tell when the alcohol had been consumed.  (Schmid Hr'g Test.; Steines Hr'g Test.; Gov. Ex. 2 at 2, 3.)  Deputies tried for several minutes to deescalate the situation before Deputy Schmid was able to sweep Defendant's legs and bring him to the ground.  (Schmid. Hr'g Test.; Gov. Ex. 5 at 19:18.)  It took several officers to subdue Defendant and handcuff him. (Gov.

---

[8] Deputies Schmid, Steines, and Omar testified that based on their training and experience, the aforementioned list of behaviors are signs of intoxication.

Ex. 5 at 19:19-20:32.)[9]  Defendant was then arrested and placed in the rear of a patrol car where he proceeded to bang his forehead against the Plexiglas between the front and back seats of the car.  (Schmid Hr'g Test.; Gov. Ex. 3 at 2:03.)  Defendant cut his forehead and was bleeding, officers wanted to remove him from the car so paramedics could tend his wounds, and Defendant wanted to speak to his father before being treated. (Schmid Hr'g Test.; Gov. Ex. 3 at 3:50.)  A deputy placed an apparently breathable bag over Defendant's head so law enforcement could interact with Defendant without being spat on.  Officers also wanted someone to secure Defendant's trailer and his property. (Schmid Hr'g Test.; Steines Hr'g Test.)

Deputy Omar, who had arrived on the scene "a couple minutes or so" prior to Defendant being taken into custody, and another officer went to Defendant's father's residence, which was next door at number 4140, to get Defendant's father, James Maccani ("James").  (Omar Hr'g Test.)  Officers wanted James to calm Defendant down and to secure Defendant's trailer.  (*Id.*)   When he was walking down James's long driveway to the scene, Deputy Omar noticed that James was somewhat unsteady on his feet and that walking down the hill was "kind of difficult for him."  (*Id.*)  James also stated he had a knee issue and back issue.  (*Id.*)  Deputy Omar offered James his arm for support, but James declined.  (*Id.*)  Defendant told officers that his father was 81-years-old and had trouble walking.  (Gov. Ex. 3 at 3:53.)  Defendant was eventually convinced to go to the hospital for treatment and left the scene in an ambulance.  (Gov. Ex. 5 at 25:00-26:35.)  Before he left for the hospital, Defendant told James he could find the keys and lock to his trailer hanging inside the trailer and asked James to secure the trailer

---

[9] As soon as Defendant was subdued, Deputy Omar entered the trailer to conduct a protective sweep for other individuals.  (Omar Hr'g Test.)  Deputy Omar found no one else and saw no contraband. (*Id.*)

for him because he was worried someone would steal his possessions. (*Id.* at 22:20, 24:11-24:54.)

After Defendant was taken to the hospital, officers began to process the scene. Officers noted items that were in plain view including a Kel Tec handgun that was lying in the open doorway to the trailer; a bandolier containing 12-guage shotgun shells that was located in the lawn chair outside of the trailer; and an orange prescription-type bottle containing a green leafy substance officers believed, based on their training and experience, contained marijuana that was found on the threshold to the trailer.[10] (Schmid Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.; Gov. Ex. 2 at 1, 3.) Officers explained that while merely possessing a firearm is not illegal in the state of Iowa, possessing a firearm while being intoxicated is illegal. (Schmid Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.)

Officers also had to secure Defendant's trailer. As part of that process, they had to blow out a candle Deputy Omar had noticed previously when he did his protective sweep of the trailer. (Omar Hr'g Test.) Although the candle was in a candle holder, the candle, itself, had an open flame. (Gov. Ex. 2 at 5.) The candle was located on a notebook on the bunk inside the trailer. (Omar Hr'g Test.) The bunk was located in the back section of the trailer, to the left of the open door described above. Deputy Omar estimated that the bunk started at the wheel well and reached to back end of the trailer. (Omar Hr'g Test.; Gov. Ex. 2 at 4.) The bunk appears to run the entire width of the trailer. (Gov. Ex. 2 at 5.) The trailer's ceiling is raised at that point and deputies estimated that the bunk was between three and four-and-one-half-feet off the floor of the trailer. (Schmid Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.) Deputy Omar asked

---

[10] Deputies Schmid, Steines, and Omar all testified that although they had seen marijuana stored in orange prescription bottles before, they had never seen catnip or oregano stored in such a manner. (Schmid Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.)

permission from James to enter the trailer and blow out the candle because Defendant "put the possession of the trailer into his father's possession at the time before he went to the hospital" and because officers did not "think James was able to climb up to blow out the candle. (Omar Hr'g Test.; Gov. Ex. 4 at 00:04-30; Def. Ex. C at 2.)

Once he received permission, Deputy Omar entered the trailer to blow out the candle. Deputy Omar first unsuccessfully tried to blow out the candle while standing at the side of the bunk, but discovered he was not close enough. (Omar Hr'g Test.) He had to step on a chair and lean in to blow out the candle.[11] (Id.) When he was in the trailer to blow out the candle, Deputy Omar saw contraband in plain view: the handgun with the safety off in the doorway of the trailer, a sawed-off shotgun on the bunk, and what Deputy Omar thought was a camouflaged rifle on the bunk.[12] (Id.) It was only illegal for Defendant to possess the handgun and the rifle due to his intoxicated state, but it is always illegal to possess a short-barreled shotgun in Iowa.[13] (Id.) Prior to entering the trailer, Deputy Omar saw the prescription container containing the green leafy substance that Deputy Omar suspected was marijuana and the bandolier with shotgun shells outside the trailer. (Id.) Officers testified that when law enforcement finds one

---

[11] Based on his understanding of James's physical condition from his observations of James, Deputy Omar testified that this is not something James could have accomplished. (Omar Hr'g Test.) Likewise, Deputies Schmid and Steines both testified that they did not feel James could have climbed into the trailer and up to blow out the candle. (Schmid Hr'g Test.; Steines Hr'g Test.)

[12] The suspected rifle actually turned out to be a BB gun.

[13] "The term 'short-barreled shotgun' means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches." 18 U.S.C. § 921. Iowa Code § 724.1C incorporates this definition and makes possession of a short-barreled shotgun or rifle a Class D felony under Iowa law. The terms "sawed-off shotgun" and "short-barreled" shotgun are used somewhat interchangeably, even though the length of the barrel(s) or their overall length makes the possession of them criminal, rather than the fact that they have be modified.

9

handgun on the threshold of a trailer, they always look for another one inside the trailer because there is usually more than one handgun or other items associated with handguns such as ammunition, holsters, etc. (Schmid Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.) Likewise, when officers find marijuana on the threshold of a trailer, they always look for more drugs and paraphernalia inside the trailer because there will likely be other drugs or paraphernalia when some has already been found. (*Id.*) Finally, the officers testified that if they find evidence of intoxication outside a trailer, they will usually find alcohol inside. (*Id.*) After Deputy Omar blew out the candle, officers secured the trailer and applied for a search warrant for the trailer.

The warrant application was written and submitted by Deputy Schmid and signed by Judge Cynthia S. Finley. (Doc. 31-1 at 9-20.) The particulars of the warrant will be described and discussed below. Pursuant to the search of the trailer, officers seized at least the sawed-off shotgun, the suspected camouflaged rifle, and ammunition.[14] (Steines Hr'g Test.) More facts will be discussed as necessary.

## III. DISCUSSION

Defendant argues that the Court should suppress the following evidence:

the Harrington & Richardson, Topper Model 88 modified shotgun, along with any ammunition in the shotgun, all other ammunition seized from Mr. Maccani's trailer, as well as any evidence of measurements and photographs of the shotgun, because law enforcement's entry into his trailer violated his Fourth Amendment rights, the automobile exception does not apply, and the search warrant was not supported by probable cause, nor did it set forth the items to be seized with the required specificity.

---

[14] The testimony was inconsistent as to whether the handgun, suspected marijuana, and bandolier containing shotgun shells that were in plain sight were seized prior to the execution of the search warrant because they were in plain view or if they were later seized pursuant to the search warrant. (Schmid Hr'g Test.) Resolution of this issue is not necessary because no one disputes that these items were in plain view and were eventually seized, and the only items seized on August 17, 2020 that form the basis of Defendant's current motion are the sawed-off shotgun and the ammunition found in the trailer.. (Doc. 30.)

10

(Doc. 39 at 1.)  Defendant also argues that the plain view exception to the warrant requirement does not apply in this case, James did not have full authority to grant law enforcement permission to enter the trailer, and evidence does not support the Government's claim that officers had the right to enter the trailer under the community care-taking doctrine.  (Doc. 31 at 5-7.)

The Government responds that the warrant was supported by probable cause and that the Court should deny Defendant's motion for the following reasons:

> (1) the automobile exception to the search warrant exception applies to the trailer, making the search permissible and a search warrant unnecessary; (2) the seizure of the sawed-off weapon and related evidence is admissible because, even without a warrant, the weapon was in plain view[;] and (3) the search warrant and affidavit were constitutionally sufficient.

(Doc. 38 at 1.)

### A.  *The search warrant did not violate the Fourth Amendment.*

### 1.  *The Application and Affidavit in Support of the Warrant*

On August 17, 2020, Deputy Schmid applied for a search warrant for Defendant's trailer.  (Doc. 31-1.)  In his Application, Deputy Schmid first described the trailer and its location.  (*Id.* at 9.)  He then stated the following:

> [I]n Linn County, there is now certain property, namely:

> Deputy Stienes [sic] ■ of the Linn County Sheriff's Office observed Phillip James Maccani ■ possess in his hands a long gun. Mr. Maccani then put the gun in his trailer located in front of 4120 Elkhorn Drive and he also tossed an object further into the trailer. Mr. Maccani was intoxicated at the time of the confrontation with Linn County Sheriff's Deputies.  From the open door of the trailer I observed a bottle with a green leafy substance believed to be marijuana. A bandoleer [sic] with shotgun rounds was located in a chair directly outside the trailer door.

(*Id.*)

11

Deputy Schmid chose the following boxes indicating the property identified above is:

(xx)   Property, the possession of which is illegal.
(xx)   Property used or possessed with the intent to be used as the means of committing a public offense or concealed to prevent an offense from being discovered.
(xx)   Property relevant and material as evidence in a criminal prosecution.

The facts establishing the foregoing ground(s) for issuance of a search warrant are set forth in the Attachments which are made part of this Affidavit.

(*Id.* at 10.)

In his Attachment, Deputy Schmid stated the following:

Affiant's Name: Deputy Dylan Schmid ██████
Occupation: Linn County Deputy Sheriff          Number of Years: 10
Assignment: Patrol Deputy          Number of Years: 3

This Deputy Dylan Schmid ██████ has been assigned to the Patrol Division of the Linn County Sheriff's Office for three years.

Based on the aforementioned facts, and at the request of the Linn County Attorney, I respectfully request that a warrant be issued in support of the Linn County Sheriff's Office investigation into possible violations of state law, it is believed that evidentiary items of multiple firearms, offensice [sic] weapons and illegal narcotics are believed be [sic] contained inside a tan box trailer located in front of the residence of 4120 Elkhorn Drive Cedar Rapids, IA with license plate of ██████.

(*Id.* at 11.)

The warrant was granted and executed. (*Id.* at 16-18.) There is no list of the items seized pursuant to the warrant in evidence. However, there is no dispute that the shotgun and ammunition that Defendant seeks to suppress were seized pursuant to the warrant.

12

## 2.    Relevant Law

The Fourth Amendment to the United States Constitution provides that "no [search] Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted). "In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam)); *see also United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) ("[T]he decision to issue the warrant is to be upheld if supported by substantial evidence on the record."). "When a magistrate relies solely on an affidavit to issue the

13

warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal quotation marks omitted). Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 238–39).

A substantial basis only requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citing *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir.1993)). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted). Defendant bears the burden of proving the warrants were issued without probable cause. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)). "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

14

### 3. The Parties' Positions

Defendant argues that the warrant does not set forth probable cause for the warrant or describe with particularity the items to be seized pursuant to the warrant. (Doc. 31 at 8-13; Doc. 39 at 7.) The Government responds that the affidavit provided two independent grounds establishing probable cause and did so with sufficient particularity. (Doc. 36 at 13-17.)

### 4. Probable Cause

Defendant argues that although the warrant Application states that the "foregoing ground(s) for issuance of a search warrant are set forth in the Attachment which are made part of this Affidavit, neither Attachment A nor B sets forth "any facts whatsoever which allow for a finding of probable cause." [15] (Doc. 31 at 9.) According to Defendant, Attachment A merely stated how long Deputy Schmid has worked with the Linn County Sheriff's Office, and "gives a conclusory statement that evidentiary items of 'multiple firearms, offensive [sic] weapons and illegal narcotics are believed to be contained inside a tan box trailer.'" (*Id.* ([sic] in Defendant's Brief).) Defendant argues that nothing in Attachment A ("the Attachment") demonstrates a fair probability that evidence of a crime will be found, "since the Attachment[] provide[s] no background for the belief that 'multiple firearms, offensive [sic] weapons and illegal narcotics' will be in the trailer or why their possession is illegal." (*Id.* ([sic] in Defendant's Brief).)

Defendant asserts that the Application paragraph contains the only language that the Government could possibly argue establishes probable cause:

> Deputy Stienes [sic] ███ of the Linn County Sheriff's Office observed Phillip James Maccani ███ possess in his hands a long gun. Mr. Maccani then put the gun in his trailer located in front of 4120 Elkhorn Drive and he also tossed an object further into the trailer. Mr. Maccani was intoxicated

---

[15] Attachment B is a blank form to be used only if the affiant is relying on information provided by a confidential informant. Therefore it is understandable that Attachment B was not completed in conjunction with this warrant application. (Doc. 31-1 at 13-14.)

at the time of the confrontation with Linn County Sheriff's Deputies. From the open door of the trailer I observed a bottle with a green leafy substance believed to be marijuana. A bandoleer [sic] with shotgun rounds was located in a chair directly outside the trailer door.

(*Id.*)  Defendant, however, takes issue with this paragraph and argues that it ultimately does not establish probable cause for the following reasons: (1) It is not clear these are the facts Deputy Schmid was relying upon. The language is not contained in the Attachment, but is listed under a section of the affidavit where the affiant is to describe the property to be seized.  (2) Even assuming the paragraph sets forth the facts upon which Deputy Schmid relied, Defendant asserts it does not amount to probable cause because it is not illegal for a person to possess long gun in city limits or a bandolier with shotgun ammunition.  (*Id.* at 10.)  Defendant further argues:

> The language mentions nothing about the modified nature of the long gun, such that the magistrate could have concluded that possession of the gun violated federal or state laws prohibiting the possession of sawed-off shotguns. The language says nothing about Mr. Maccani allegedly possessing any firearms while disobeying law enforcement commands. It does mention a "green leafy substance believed to be marijuana," but provides no information as to why law enforcement believed the substance was marijuana rather than tobacco, or catnip, or a dried herb, all of which are legal to possess. The language does not indicate that the leafy substance smelled like marijuana, or was accompanied by drug paraphernalia. Last, while the paragraph states that Mr. Maccani was "intoxicated" and he possessed "in his hands a long gun," *see* Iowa Code 724.4C (possession or carrying of dangerous weapons while under the influence), it provides no information as to why law enforcement thought Mr. Maccani was intoxicated nor information as to why law enforcement believed he was on land that he did not lawfully own or possess.

(*Id.*)

Defendant is correct that the language supplying the factual information is not contained in the Attachment as the form suggests.  Drafting imprecision does not

necessarily rise to the level of a constitutional violation. Here, it is obvious that the judge read the Application containing the information at issue because she signed the Application portion of the warrant application materials in addition to signing the Attachment and the warrant. (Doc. 31-1 at 9-17.) Moreover, the information in the Application is incorporated into the Attachment by reference because the substantive paragraph of the Attachment begins "[b]ased on the aforementioned facts," and therefore incorporates the information from the Affidavit that precedes it. (*Id.* at 11.) Under Iowa law, which no doubt would be relevant to Judge Finley's reading of the warrant application,

> Under the doctrine of incorporation by reference, one document becomes part of another separate document simply by reference as if the former is fully set out in the latter. *Hofmeyer v. Iowa Dist. Court*, 640 N.W.2d 225, 228 (Iowa 2001). "Where a writing refers to another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Id.* "[C]lear and specific reference is required to incorporate an extrinsic document by reference." *Id.* (emphasis added); *Estate of Kokjohn v. Harrington*, 531 N.W.2d 99, 101 (Iowa 1995). Whether material is incorporated by reference presents a question of law. *Hofmeyer*, 640 N.W.2d at 228.

*Heitritter v. Callahan Const. Co.*, 670 N.W.2d 430 (Iowa App. 2003). I conclude that the language "Based on the aforementioned facts" in Attachment A was sufficient to incorporate the facts referenced in the Application.

Defendant is also correct that under normal circumstances it is not illegal to possess a bandolier with shotgun ammunition or to possess a long gun that is not modified and that the Application does not explicitly state that Defendant "was intoxicated while he possessed in his hands a long gun." However, the Application states that Deputy Steines of the Linn County Sheriff's Office observed Defendant possess a long gun in his hands, put the gun in his trailer, and that Defendant was intoxicated "at the time of the confrontation with Linn County Sheriff's Deputies." (*Id.* at 9.) Reading the Application

and Affidavit together in a practical and common-sense way, Deputy Steines was one of the deputies involved in the "confrontation" where Defendant was intoxicated referred to later on in the paragraph. *See Zamora-Garcia*, 831 F.3d at 983. In addition, the presence of ammunition in such close proximity to the shotgun that Defendant handled, also supports the conclusion that the shotgun could be loaded. As Deputy Schmid stated in the Affidavit, these circumstances represent possible violations of state law, including, as Defendant notes, the law against possessing a dangerous weapon while being under the influence. *See* Iowa Code § 724.4C(1).

While it would have been preferable for Deputy Schmid to explain how Defendant's erratic and self-harming behavior supported his conclusion that Defendant was intoxicated, such support was not necessary to establish that Defendant was intoxicated. Indeed, the word of a citizen who is not trained in drug or alcohol detection can suffice to establish intoxication in a warrant. *See Howard v. United States*, No. 04-3662, 2005 WL 1368039, at *2 (8th Cir. June 10, 2005) (unpublished decision) (citizen complaint that defendant appeared intoxicated and was acting irrationally while discharging a firearm part of exigent circumstances to dispense with knock-and-announce requirement). In this case, as in *Howard*, legal intoxication such as is necessary for the purpose of establishing an operating while intoxicated charge or a similar charge is not at issue.

Similarly, the argument that the Application contains no information as to why law enforcement believed Defendant was on land that he did not lawfully own or possess is without merit. Again, Deputy Schmid's drafting could have been clearer if he would have said that the vehicle described was a tan box trailer located "on the public street in front of the residence of 4120 Elkhorn Drive, Cedar Rapids, Iowa." However, in the context presented here, "in front of" is generally accepted as meaning "on the street in front of" rather than on private property associated with, or in the driveway of, which

18

would be private property. *See United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1026 (8th Cir. 2007) (mother of alleged victim said she would be waiting in car "parked in front of the house" and her daughter walked out front door and down sidewalk toward officers and her mother); *United States v. Williams*, 604 F.2d 1102, 1111 (8th Cir. 1979) (gold Monte Carlo parked "in front of the house," men got into the Monte Carlo, and drove off); *United States v. Harris*, No. CRIM.10-50 (RHK/FLN), 2010 WL 2104583, at *1 (D. Minn. Apr. 21, 2010), *R. & R. adopted*, 2010 WL 2104588 (D. Minn. May 25, 2010) (police officer responded to report from citizen of car parked "in front of her house" with two people inside, one with a gun, by parking next to car, getting out of his squad car, and approaching parked car on foot alone, while waiting for backup).

Finally, Defendant's argument that Deputy Schmid did not explain why he thought the green leafy substance he observed in a bottle was marijuana is without merit. Law enforcement's observation and belief that a "green leafy substance" is marijuana is sufficient for describing the substance in a search warrant. *United States v. McClellon*, 578 F.3d 846, 850-51 (8th Cir. 2009) (search warrant based on investigation, including "tobacco pouch containing a green leafy substance . . . that [investigator] believed to be marijuana"); *United States v. Hurd*, No. CR00-4002-DEO, 2000 WL 34033043, at *2 (N.D. Iowa Mar. 21, 2000) (search warrant for house based on contraband found during search during traffic stop, including "two baggies containing green leafy substance believed to be marijuana")[16]; *see also United States v. Criswell*, 696 F.2d 636, 640 (8th Cir. 1983) (seizure of "green leafy substance believed to be marijuana" under plain view

---

[16] This is a report and recommendation. Based on the history of the case, the defendant apparently pleaded guilty before the court had the opportunity to accept or reject the R. and R. because the defendant's sentence was affirmed by the Eighth Circuit less than eight months after the R. and R. was filed. *See United States v. Hurd*, 23 F. App'x 601 (8th Cir. 2001) (per curiam) (unpublished decision).

doctrine). Deputy Schmid was a trained law enforcement officer who had been with the Linn County Sheriff's Office for ten years (Doc. 31-1 at 11), which gave his identification of a common controlled substance like marijuana credibility.

Therefore, I find the Application and Affidavit provided "a fair probability that contraband or evidence of a crime" would be found in the trailer. *Kail*, 804 F.2d at 444. In conclusion, although Judge Finley may have had to "draw [a few more] reasonable inferences from the totality of the circumstances in determining whether probable cause exist[ed] to issue [this] search warrant" than ideal, *Keele*, 589 F.3d 944, I find that substantial evidence supports the decision to issue the warrant. *See Hallam*, 407 F.3d 948.

### 5. *Particularity*

Defendant asserts that the warrant is "devoid of a description of the items law enforcement intended to seize. . . . Rather, it contains the paragraph . . . describing what allegedly transpired on August 17, 2020. As such the warrant is invalid." (Doc. 31 at 11.) Defendant argues that the warrant in this case is analogous to the warrant in *Groh v. Ramirez*, 540 U.S. 551 (2004). In *Groh*, the application for a search warrant of the respondents' home described with particularity the place to be search and the contraband the affiant expected to find. 540 U.S. at 554. The search warrant, however, did not incorporate by reference the itemized list of items expected to be seized from the application. *Id.* at 554-55. Rather, the warrant described the exterior of respondents' house where it should have described the items to be seized. *Id.* at 554. After the warrant was executed, the respondents sued the petitioner under several theories, including violation of their Fourth Amendment rights. *Id.* at 555. *Groh* held that although the warrant was based on probable cause, was supported by a sworn affidavit, and described with particularity the place to be searched, the warrant "failed altogether" to particularly describe the persons or things to be seized. *Id.* at 557. *Groh* reasoned that stating the

20

items to be seized in the application did not save the warrant from facial invalidity because the Fourth Amendment requires particularity in the warrant, not in supporting documents. *Id.* (citation omitted). *Groh* further reasoned that the warrant did not incorporate any documents by incorporation, including the list of items to be seized and therefore, there was no indication that the Magistrate actually found probable cause to search for, and seize, every item listed in the affidavit. *Id.* at 560-61.

The warrant in the case is somewhat analogous to the warrant in *Groh*. In *Groh*, the warrant failed to incorporate the itemized list of the objects of the search that could be seized included in the application. Thus, the warrant itself contained no description of these items. It is true that the warrant in the case at does not contain an itemized or numbered list of the objects of the search which is more usual in search warrants. However, this does not mean that the warrant failed to describe the items to be seized with particularity as required by the Fourth Amendment. Rather than a numbered list, the warrant included the following narrative description:

> [I]n Linn County, there is now certain property, namely:
>
> Deputy Stienes [sic] ███ of the Linn County Sheriff's Office observed Phillip James Maccani ███ possess in his hands a long gun. Mr. Maccani then put the gun in his trailer located in front of 4120 Elkhorn Drive and he also tossed an object further into the trailer. Mr. Maccani was intoxicated at the time of the confrontation with Linn County Sheriff's Deputies. From the open door of the trailer I observed a bottle with a green leafy substance believed to be marijuana. A bandoleer [sic] with shotgun rounds was located in a chair directly outside the trailer door.
>
> which is:
> .   .   .
> (xx)    Property, the possession of which is illegal.
> (xx)    Property used or possessed with the intent to be used as the means of committing a public offense or concealed to prevent an offense from being discovered.
> (xx)    Property relevant and material as evidence in a criminal prosecution.

21

(Doc. 31-1 at 16-17.) This information contained on the second page of the warrant distinguishes the case from *Groh*. Reading the narrative paragraph in conjunction with the categories marked "xx" to indicate the relevance of the items to the investigation, clearly shows that the warrant is seeking items of personal property which may be illegal to possess (i.e., marijuana), that may have been used to commit a public offense (i.e., the gun and the marijuana) and that may be evidence of a crime (i.e., the gun and the marijuana). It would seem to exalt form over substance to declare this description insufficiently particular because the items sought are included in what appears to be a narration of events. I note that the narration mentions no extraneous items that might have created confusion about objects of the search. For example, the narration did not mention books or papers observed in the trailer or the presence of a smart phone. Since the only objects identified as being in the trailer were the gun and the and the marijuana, there was no danger of the search becoming more general.

Therefore, although the warrant is "not the model of clarity or a paradigm to be copied by future law enforcement officers," *United States v. Graham*, No. CR09-3026-MWB, 2009 WL 3151219, at *3 (N.D. Iowa Sept. 28, 2009) (quoting *United States v. Nunley,* 10 Fed. Appx. 386, 2001 WL 574581 (8th Cir. 2001)), *R. & R. adopted,* 2009 WL 3345765 (N.D. Iowa Oct. 15, 2009), it was sufficient to allow officers to know the scope of a permissible search and the items they could legally seize under the warrant. *See Groh*, 540 U. S. at 560-61.

### 6. *Recommendation*

Based on the above discussion, I **recommend** the District Court **deny** this part of Defendant's motion.

**B.** **The Leon *good faith exception applies to the warrant.***

The Government argues that even if the Court finds the warrant lacked probable cause, the *United States v. Leon* good faith exception applies to the warrant. (Doc. 36 at 16-17.) Reviewing courts should not suppress evidence seized pursuant to a search warrant, even if the reviewing court determines probable cause was absent, if the officers applying for the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984). Under this "good-faith exception," if a law enforcement officer's reliance on a warrant so issued was objectively reasonable, the evidence seized pursuant to the invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* recognized four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate.[17] 485 F.3d at 431.

Defendant asserts that the fourth *Proell* scenario applies to the warrant in this case, "the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid." *Id.* (internal quotation marks omitted). Defendant argues the following:

> [T]his case is distinguishable from cases in which the warrant itself does not does not [sic] describe the items to be seized, but the affidavit and attachments do, and they are clearly incorporated into the search warrant. *See e.g., United States v. Hamilton*, 591 F.3d 1017, 1028 (8th Cir. 2010). In those types of cases, exclusion of evidence is not proper. In the instant

---

[17] (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge 'wholly abandoned his judicial role' in issuing the warrant; (3) when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*'; and (4) when the warrant is 'so facially deficient' that no police officer could reasonably presume the warrant to be valid.

*Proell*, 485 F.3d at 431 (quoting *Leon*, 468 U.S. at 923; citing *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)) (emphasis in original).

23

case, the warrant does not incorporate the application and Attachments, and even if it is more like that in *Groh*, in which the Court held exclusion of the seized evidence was proper. In *Groh,* although the application adequately described the things to be seized, the application was not incorporated into the search warrant. The Court stated, "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *Groh*, 540 U.S. at 563. The facial invalidity of the warrant is even more glaring in Mr. Maccani's case, because here, there is not even an application which particularly describes the things to be seized. Moreover, Deputy Schmid not only prepared the search warrant, he himself helped execute it. Def. Ex. B, p. 10. In such a situation, the government cannot argue that Schmid reasonably relied on the magistrate's assurance that the warrant contaned an adequate description of the things to be seized, and was consequently valid, since he himself prepared the warrant. *Id.* at 564.

(Doc. 31 at 14-15.)

The Government responds that the warrant "specifically identifies certain items to seize that are readily knowable and easily linked to a criminal investigation (even if the items are included in a narrative paragraph). Therefore, even if the warrant [is] . . . not valid, the officers who executed the warrant to search did so in good faith. . . ." (Doc. 36 at 17.)

"The standard announced in *Leon* is an objective one." *United States v. Gaetna*, No. CR05-1021, 2005 WL 2320062, at *4 (N.D. Iowa Sept. 22, 2005), *aff'd sub nom. United States v. Engler*, 521 F.3d 965 (8th Cir. 2008). Thus, the fact that Deputy Schmid both applied for and executed the warrant is irrelevant. Here, although not listed in a precise fashion, specific items of contraband were included in the narrative paragraph on the first page of the warrant. (Doc. 31-1 at 16.) Thus, I find the warrant was not so "facially deficient that no police officer could reasonably presume the warrant to be valid" and it was not objectively unreasonable for law enforcement officers to rely on this warrant, which was issued by a neutral judge. *Proell*, 485 F.3d at 430-31.

In determining whether law enforcement's reliance on a warrant was "entirely unreasonable," "[t]he court must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). *Leon* explained that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

The good-faith exception routinely applies unless there are extreme circumstances which prevent its application. In *United States v. Herron*, for example, the good-faith exception did not apply because although there was no technical legal deficiency in the affidavits, there was "simply no evidence" in the affidavits linking the suspect to criminal activity. 215 F.3d 812, 814 (8th Cir. 2000). That is not the case with the warrant before the Court.

Accordingly, even if the District Court finds that the warrant violated the Fourth Amendment because it lacked probable cause or particularity, I recommend the Court find that officers could reasonably rely on Judge Finley's assessment of probable cause under the *Leon* good faith exception.

### C.    *The automobile exception to the warrant requirement applied to the search of the trailer.*

The shotgun Defendant seeks to suppress was located on Defendant's bunk and was seized pursuant to the warrant. The ammunition at issue was also seized during the warrant search of the trailer. Although officers obtained a warrant to search the trailer, the Government argues, in the alternative, that a search of the trailer was authorized

under the automobile exception to the search warrant requirement. Even if a search warrant is determined to be invalid, the automobile exception can be applied to the search. *United States v. Holleman*, 743 F.3d 1152, 1158 (8th Cir. 2014) (citing *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996)). Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41 (citations omitted). The burden is on the Government to justify warrantless searches. *Carter*, 729 F.2d at 940.

To determine whether the automobile exception to the search warrant requirement applies to Defendant's trailer, the trailer must have been "'[1] readily capable' of 'being used on the highways' and must have been '[2] found stationary in a place not regularly used for residential purposes.'" *Holleman*, 743 F.3d at 1158 at (quoting *California v. Carney*, 471 U.S. 386, 392 (1985)); *United States v. Ross*, No. 17-CR-4071-LTS-1, 2018 WL 3091623, at *10 (N.D. Iowa Apr. 11, 2018) ("Under the automobile exception, when officers have probable cause to search a vehicle, "[a] warrant is not required . . . if [the vehicle] 'is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes.'" (quoting *United States v. Long*, 900 F.2d 1270, 1277 (8th Cir. 1990)) (alterations in original), *R. & R. adopted*, 2018 WL 1911344 (N.D. Iowa Apr. 23, 2018).

Defendant argues that the trailer should be treated like a camper being used as a living space rather than as a vehicle because the trailer contained a bed, water, food, clothing, and cooking supplies. (Doc. 39 at 2.) Defendant also argues that because the trailer's towing tongue was up on a wooden block, there were wheel chocks behind the wheels, and the solar panels were set up outside of the trailer, he was entitled to greater

26

privacy in the trailer than if the trailer was simply being used to haul items or store property.  (*Id.* at 2-3.)  The Government responds that the trailer was parked on a public road; was in operable condition; could be moved easily "within minutes (or seconds) simply by kicking the blocks out from under the tires, unhooking the solar panels, and hitching the trailer to the truck (which was parked just a few feet from the trailer)"; and the trailer was subject to state licensing requirements and was licensed.  (Doc. 38 at 2.) In addition, the Government argues that officers had probable cause to conduct a warrantless search of the entire trailer based on (1) Defendant's "obvious intoxication"; (2) the presence of firearms on the threshold of the trailer, in Defendant's hand at the beginning of his altercation with deputies, and what Defendant said about having a shotgun; and (3) what appeared to be marijuana in plain view on the threshold of the trailer.  (*Id.*)

If a motor home is "being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes-temporary or otherwise-the two justifications for the vehicle exception come into play." *California v. Carney*, 471 U.S. 386, 392–93 (1985).  *Carney* reasoned that even though the motor home at issue in the case possessed attributes of a home, the fact that it could be made mobile "by the turn of an ignition key, [even] if not actually moving," and the "reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling" justified an immediate search of the motor home "before the vehicle and its occupants "[became] unavailable." *Id.* at 393.  *Carney* rejected the respondent's argument that the automobile exception to the warrant requirement did not apply to the motor home because it was "capable of functioning as a home" for the following reasons:

> To distinguish between respondent's motor home and an ordinary sedan for purposes of the vehicle exception would require that we apply the exception depending upon the size of the vehicle and the quality of its appointments.

Moreover, to fail to apply the exception to vehicles such as a motor home ignores the fact that a motor home lends itself easily to use as an instrument of illicit drug traffic and other illegal activity. In *United States v. Ross*, 456 U.S., at 822, 102 S. Ct., at 2171, we declined to distinguish between "worthy" and "unworthy" containers, noting that "the central purpose of the Fourth Amendment forecloses such a distinction." We decline today to distinguish between "worthy" and "unworthy" vehicles which are either on the public roads and highways, or situated such that it is reasonable to conclude that the vehicle is not being used as a residence.

*Id.* at 393–94. Thus, *Carney* declared that a motor home that was taking advantage of its home-like qualities, such as the ability to draw the shades to maintain privacy, was still a vehicle. *Id.* at 388, 393-94.

The mobility of the vehicle is no longer the end of the inquiry. "[A]lthough ready mobility alone was perhaps the original justification for the vehicle exception, . . . later cases have made clear that ready mobility is not the only basis for the exception." *Carney*, 471 U.S. at 391. Another rationale justifying warrantless searches of vehicles is that a person has a less significant expectation of privacy in his or her automobile than in a home or office. *Id.* As a result, "[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Id.* at 391–92 (discussing not only a plain-view analogy regarding the passenger compartment, but also cases where the lower expectations of privacy permitted entry into a locked trunk, sealed packages, and hidden compartments). This diminished expectation of privacy "derive[s] . . . from the pervasive regulation of vehicles capable of traveling on the public highways." *Id.* at 392.

Following *Carney*, the Eighth Circuit has noted that both ready mobility and the reduced expectation of privacy in a vehicle justify warrantless searches under the automobile exception. *See, e.g., United States v. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987) (applying the automobile exception to a station wagon on the defendant's property that matched the description of a vehicle witnesses had spotted near the scene of a theft). Based on these rationales, the Eighth Circuit has found a warrantless vehicle search justified under the automobile exception where a pickup truck was

stuck in a ditch because it had not "lost its inherent mobility" and "could have been driven away" if it was simply towed "out of the ditch." *United States v. Maggard*, 221 F.3d 1345 (8th Cir. 2000) (per curiam) (unpublished table decision). The automobile exception also applies to parked cars, even where the officers are aware that they are unlikely to be driven away, because "[i]t is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, that gives rise to the *Ross* standard which allows for warrantless searches when probable cause exists." *United States v. Perry*, 925 F.2d 1077, 1080–81 & n.4 (8th Cir. 1991) (applying the exception where the vehicle was parked in a school parking lot and the occupants were unlikely to drive it away because they had already been arrested at the time the search was conducted).

*United States v. Alatorre*, No. 019-CR-00061-ECT-KMM, 2019 WL 5149971, at *12 (D. Minn. July 22, 2019) (alterations in original), *R. & R. adopted sub nom. United States v. Haydee Alatorre*, (ECT/KMM), 2019 WL 4463401 (D. Minn. Sept. 18, 2019).

Courts that that have addressed this, or similar issues, hold that when campers, mobile homes, or trailers are easily movable, they are considered "vehicles" for purposes of the automobile exception to the warrant requirement, even when the campers or mobile homes are parked on private property or have qualities that indicate they are more like a residence than Defendant's trailer. *See United States v. Navas*, 597 F.3d 492, 500 (2d Cir. 2010) (trailer "affixed with at least one axle and one set of wheels" and "capable of being attached to a cab and driven away" subject to the automobile exception, even though it was unhitched from a cab and was sitting in a warehouse); *United States v. Napoli*, 530 F.2d 1198, 1200–01 (5th Cir. 1976) (affirming search of locked camper bus located in driveway of house that was subject of warrant search because "the object of the search was moveable contraband"); *State v. Otto*, 840 N.W.2d 589, 594–95 (N.D. 2013) (applying *Carey* and *Navas* to affirm search of camper that had its "landing gear" down and that was plugged into power and not hooked up to a vehicle because trailer was parked in place not regularly used for residential purposes and could be mobilized in a

29

"very short time"); *Heffernan v. State*, 385 So. 2d 1060, 1061 (Fla. Dist. Ct. App. 1980) (affirming denial of motion to suppress search of pop-up camper in which defendants lived that was located in the driveway of a house that was the subject of a search warrant and was hooked up by umbilical cords to electricity and water to the house because the warrant authorized the search of "vehicles");[18] *see also United States v. Luna*, 368 F.3d 876, 876-77 (8th Cir. 2004) (affirming consensual search of motor home after traffic stop and referring to motor home as "vehicle"); *United States v. Kinney*, No. 4:05CR00280ERW, 2005 WL 3213909, at *2 (E.D. Mo. Nov. 30, 2005) (motor home located inside commercial building was legally searched under warrant allowing search of building and all "vehicles" located on property or associated with property, in spite of defendant's argument that motor home was his residence).

Although not directly on point, the Eighth Circuit decided in *United States v. Houck* that an RV being used as a residence that was parked in a private driveway connected to water and electric lines, although with no permanent attachments to the ground, and that had a satellite dish attached to the roof was subject to the automobile exception to the warrant requirement. 888 F.3d 957, 958, 961 (8th Cir. 2018). *Houck* reversed the district court and held that it was not objectively unreasonable for officers executing a search warrant in that case to conclude that the RV was a vehicle because the RV was licensed and tagged like a vehicle, had fully-inflated tires, had no permanent attachments to the ground, would only take about 30 minutes to prepare for travel, was parked in a driveway with ready access to the roadway, and the truck used to tow the RV was parked next to it and had a towing hitch. *Id.* at 598, 561. Moreover, although the RV was registered in Missouri, it was parked in Pennsylvania. *Id.* at 561.

---

[18] In the alternative, *Heffernan* also affirmed the denial of the motion to suppress because the camper was located within the curtilage of the house and was therefore included within the scope of the search warrant. 385 So. 2d. at 1061.

Moreover, the Eighth Circuit has recently indicated that the applicability of the automobile exception is unlikely to turn on the how readily mobile the vehicle is:

> The automobile exception may apply even when there is little to no chance that the vehicle will be moved or its contents destroyed. *Cady v. Dombrowski*, 413 U.S. 433, 441–42, 93 S. Ct. 2523, 37 L. Ed.2d 706 (1973). Officers armed with probable cause "may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *United States v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020) (quoting *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S. Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam)). The automobile exception continues to apply to impounded vehicles when an immediate search could have been conducted on the scene. *Brewer v. Wolff*, 529 F.2d 787, 792 (8th Cir. 1976) (interpreting *Texas v. White*, 423 U.S. 67, 96 S. Ct. 304, 46 L. Ed.2d 209 (1975)).

*United States v. Soderman*, 19-2879, 2020 WL 7483576, at *4 (8th Cir. Dec. 21, 2020).

I find that Defendant's trailer was a vehicle for purposes of the automobile exception to the warrant requirement. First, although Defendant characterizes the area as a "residential neighborhood," the trailer was found on a public street, which is "a place not regularly used for residential purposes." *Carney*, 471 U.S. at 392. Second, although the trailer had some trappings of a residence, i.e., a bunk, clothes, food, cooking utensils, a lawn chair, and books, and was up on blocks and had chocks behind the wheels, it was more like a vehicle than a residence under the case law. The trailer was parked mere feet behind the truck that had towed it to its current location, with ready access to larger roadways beyond, which is analogous to the situation in *Houck*. 888 F.3d at 598, 561. Moreover, like the RV in *Houck*, which was not searched in its home location of Missouri, Defendant's trailer was not searched in its home location of Iowa Falls. (Gov. Ex. 5 at 10:32.) In addition, the trailer was licensed, had "one set of wheels" and was "capable of being attached to a [truck] and driven away" like the trailer in *Navas*, 597 F.3d at 500. (Def. Ex. A at 2; Gov. Ex. 2 at 4; Omar Hr'g Test.) The

truck had a trailer hitch that the trailer could be attached to. (Gov. Ex. 2 at 8.) Moreover, the trailer could be made ready to travel in minutes or even seconds, which makes it like the camper bus and camper in *Napoli*, 530 F.2d at 1200–01 and *Otto*, 840 N.W.2d 594–95, respectively, which were determined to be vehicles for purposes of the exception. (Schmid Hr'g Test.; Omar Hr'g Test.) Thus, even though Defendant did sleep in his trailer, the reasoning of *Carney* still prevails: even though a motor home "possesse[s] some, if not many of the attributes of a home," it falls under the automobile exception if it is "readily capable" of being "used on the highways" and "is found stationary in a place not regularly used for residential purposes." 471 U.S. at 392; *Houck*, 888 F.3d at 961 (relying on the fact that the RV was readily capable of being made ready for travel in 30 minutes and access to roadway to reverse the district court, even though the RV was being used as a residence and was hooked up to water and electricity).

Although Defendant argues that he was in custody during the search and could not move the trailer (Doc. 39 at 3-4), that argument is without merit. *Soderman*, 2020 WL 7483576, at *4. Moreover, law enforcement need not assume that James or some other person would not remove the trailer from the scene. As the cases gathered in *Alatorre* demonstrate, "[i]t is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, . . . which allows for warrantless searches when probable cause exists." 2019 WL 5149971 at *12 (alterations in original).

Defendant makes much of footnote 3 in *Carney*. (Doc. 39 at 3.) In rejecting the respondent's argument that the motor home could have been used as a home in spite of being parked on a city street, *Carney* stated, "Our application of the vehicle exception has never turned on the other uses to which a vehicle might be put. The exception has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation."

471 U.S. at 394. Footnote 3 is at the end of this sentence. *Id.* Footnote 3 provides the following:

> We need not pass on the application of the vehicle exception to a motor home that is situated in a way or place that objectively indicates that it is being used as a residence. Among the factors that might be relevant in determining whether a warrant would be required in such a circumstance is its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road.

*Id.* at n.3. Defendant argues that his trailer was parked in a residential neighborhood; it contained personal effects indicating he was living in the trailer; it had a lock; there was no evidence that the trailer had recently been moved; it was obvious that he used the nearby truck for transportation, not the trailer; that he was in town to help his father clean up from the derecho; and that due to the storm, no one had power, which made it "all the more logical" that he would be living in a trailer powered by solar panels. (Doc. 39 at 4.)

While Defendant's trailer arguably has some factors cited by *Carney* as relevant to the consideration of whether a vehicle such as the trailer is being used as a home such being on blocks and having solar panels deployed, the rest of the *Carney* factors weigh in favor of the trailer being a vehicle. Although the trailer was located in a residential *area*, it was located on a public road, just like Defendant's truck, which contained the trailer hitch for towing the trailer, and thus obvious ready access to a public road. In addition, testimony at the suppression hearing showed that the trailer could be made mobile in a matter of seconds or minutes, which weighs in favor of the trailer being a vehicle, even though it was not connected to Defendant's truck, which was parked only a few feet in front of the trailer. (Schmid Hr'g Test.; Omar Hr'g Test.) In addition, the trailer was licensed like a vehicle and was subject to all the relevant regulations of the State of Iowa. *Carney*, 471 U.S. at 393. Although the solar panels were deployed, that

33

is not dispositive, as evidenced by *Houck*, where the RV was hooked up to a house's electricity and water, but was still considered a vehicle. 888 F.3d at 961. Thus, the utilities factor weighs in favor of the trailer being a vehicle. Therefore, even under the *Carney* footnote factors, the trailer is a vehicle.

Finally, the trailer in this case can be distinguished from the seemingly fully-furnished motor home in *United States v. Adams*, a case cited by Defendant, because that mobile home was located "in a rural area on a private wooded lot owned by the Defendants" rather than on a public street and "there was no convenient or easy access to a public road from where the motor home was located." 845 F. Supp. 1531, 1536–37 (M.D. Fla. 1994).

Accordingly, I find that Defendant's trailer falls under the automobile exception to the search warrant requirement. The evidence need not be suppressed because there was no warrant, if there was probable cause for the search, as discussed below.

**D.     Probable cause existed for a warrantless search of the trailer.**

I have already found that substantial evidence supported Judge Finley's finding that the search warrant set forth probable cause to search the trailer. However, as discussed above, the warrant Affidavit and Application were not stellar examples of warrant writing and I take the time to note additional reasons, not documented in the warrant but known to officers on the scene, that established probable cause for a warrantless search. "Although a warrantless search usually constitutes a per se Fourth Amendment violation, the automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle by officers possessing probable cause to do so." *Soderman*, 2020 WL 7483576, at *3 (citing *Chambers v. Maroney*, 399 U.S. 42, 51–52 (1970)).

34

Therefore, if the District Court does not agree that the four corners of the warrant established probable cause, I recommend the Court find that probable cause existed for a warrantless search at the time officers executed the search of the trailer.

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quoting *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)). Because "[p]robable cause is a practical and common-sensical standard," "an officer may draw inferences based on his own experience" to determine whether probable cause exists. *Id.* (internal quotation marks and citations omitted).

*Cronin v. Peterson*, No. 19-1054, 2020 WL 7409636, at *6 (8th Cir. Dec. 18, 2020) (finding probable cause existed for a warrantless search of an automobile).

Officers knew Defendant had a shotgun because he stated that he had one and because Deputy Steines saw it in his hand. Defendant then emerged from the trailer without the shotgun. Deputies Schmid and Steines testified that Defendant would have had time to throw the shotgun onto the bunk before coming out of the trailer. (Schmid Hr'g Test.; Steines Hr'g Test.) A green leafy substance believed to be marijuana was seen in plain view on the threshold of the trailer as was a handgun. (Schmid Hr'g Test.; Steines Hr'g Test.; Gov. Ex. 2 at 1.) All three deputies testified that they formed the opinion that Defendant was intoxicated within minutes of arriving on the scene because of his erratic behavior, language, slurred and thick-tongued speech, and eventual self-harming behaviors in the squad car. (Schmid Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.) All three deputies also testified that it is illegal to possess a firearm while intoxicated and that when they find one firearm, one container of marijuana, or evidence of intoxication, they always look for evidence of similar contraband because there is usually more similar contraband once firearms, drugs, or evidence of intoxication is

found.  (*Id.*)  All of this occurred between approximately 12:50 a.m. and 1:30 a.m. on the morning of August 17, 2020.  The trailer was searched at 5:13 a.m. on August 17, 2020.  (Doc. 31-1 at 18.)  While the officers were waiting for Deputy Schmid to obtain the search warrant for the trailer, the scene was untouched. (*See* Gov. Ex. 4 at 3:10-30.)  Thus, the information was not stale at the time the search was conducted.  I find that "viewing the totality of the circumstances, 'there [was] a fair probability that contraband or evidence of a crime [would] be found" in the trailer.  *Reed*, 921 F.3d at 757.

 In addition, this probable cause finding does not depend upon Deputy Omar's finding of the guns on the bunk when he blew out the candle.  Thus, if the District Court finds that Deputy Omar's entry into the trailer to blow out the candle was not authorized under any of the theories analyzed below, the automobile exception should still apply.

Therefore, I **recommend** the District Court find that probable cause existed for a warrantless search of the trailer.  I **further recommend** that the District Court find that the automobile exception applied to the search of Defendant's trailer.

### E. *The officers had authority to enter the trailer and seize the sawed-off shotgun and ammunition.*[19]

The plain view doctrine "permits an officer to 'seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object.'"  *United States v. Hastings*, 685 F.3d 724, 729 (8th Cir. 2012) (quoting *United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011) (quoting *United States v. Bustos–Torres*, 396 F.3d 935, 944 (8th Cir. 2005)).  Thus, if Deputy Omar was

---

[19] The sawed-off shotgun is the only item seized on August 17, 2020 that forms the basis of the federal charges in this case.  (Doc. 2 (Indictment).)

lawfully in the trailer when he saw the sawed-off shotgun and, if its incriminating nature was "immediately apparent," then officers had the lawful right to access the shotgun.[20]

### 1. The incriminating nature of the shotgun was immediately apparent to Deputy Omar.

Deputy Omar testified that he "immediately" recognized that the shotgun he saw on the bunk was modified because "[t]he stock was sawed off and the barrel was very shortened." (Omar Hr'g Test.) He also testified that although he could not tell if it was shorter than 26 inches without a ruler, "it was significantly shorter than a normal shotgun would be." (*Id.*) In Deputy Omar's view, this made the weapon illegal whether Defendant was intoxicated or not. (*Id.*) It would not have been possible to blow out the candle without seeing the sawed-off shotgun because it was in plain view on top of the bunk. (*Id.*; Gov. Ex. 2 at 6.) When Deputy Omar exited the trailer after blowing out the candle, he said there was a shotgun and a .22 rifle on the bed. (Gov. Ex. 4 at 1:32-39.)

Defendant takes issue with Deputy Omar's testimony, arguing that "[n]one of the government's witnesses testified that they recognized the gun as being less than 26 inches in length overall, or having a barrel of less than 18 inches in length." 18 U.S.C. § 921(8). (Doc. 39 at 7.) Such testimony was unnecessary. In *Texas v. Brown*, the Supreme Court recognized that the phrase "immediately apparent" is misleading ("very likely an unhappy choice of words") because "it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." 460 U.S. 730, 741 (1983) (plurality opinion).

---

[20] The Government concedes that if the plain view exception is the only basis upon which the District Court denies Defendant's suppression motion, the ammunition seized from inside the trailer must be suppressed because Deputy Omar did not see the ammunition that was found inside a cup when he went into the trailer to blow out the candle. (Omar Hr'g Test.) Thus, the ammunition was not in plain view. (Doc. 38 at 5.)

The Supreme Court clarified that an item's incriminatory nature is immediately apparent if the officer at that moment had "probable cause to associate the property with criminal activity," [*Brown*, 460 U.S.] at 741–42, 103 S. Ct. 1535 (quoting *Payton v. New York,* 445 U.S. 573, 587, 100 S. Ct. 1371, 63 L. Ed.2d 639 (1980) (internal quotation marks and emphasis omitted)), meaning "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime." *Id.* at 742, 103 S. Ct. 1535 (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543 (1925)). It does not require "any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.* (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949)).

*United States v. Cowan*, 674 F.3d 947, 953 (8th Cir. 2012). Therefore, "[t]o satisfy the 'immediately apparent' standard, it is not necessary that a law enforcement officer know with certainty that an item is contraband or evidence of a crime." *United States v. Murphy,* 261 F.3d 741, 744 (8th Cir. 2001) (citing *United States v. Garner,* 907 F.2d 60, 62 (8th Cir. 1990)) (internal citation omitted). To satisfy the immediately apparent requirement, all that is required is probable cause to associate the item or items at issue with criminal activity. *Id.* (citing *Brown,* 460 U.S. at 741-42 (quoting *Payton v. New York,* 445 U.S. 573, 587 (1980)). "While each individual action [or item] taken by [or in possession of] the defendants could be susceptible to innocent explanation, their behavior [or the items] must be considered as a whole and in the light of the officers' 'experience and specialized training.'" *United States v. Ameling,* 328 F.3d 443, 448 (8th Cir. 2003) (quoting *United States v. Arvizu,* 534 U.S. 266, 272 (2002)).

I find that Deputy Omar's reaction to the sawed-off shotgun satisfies this standard. Although he did not give precise measurements, Deputy Omar testified that it was obvious that the stock was sawed off, the barrel was shortened, and that the gun was "significantly shorter" than a normal shotgun. Deputy Omar had been employed by the Sheriff's

38

Department for 11 years and had been investigating drug and gun crimes for around three years. (Omar Hr'g Test.) Thus, Deputy Omar was experienced enough to establish probable cause that the shotgun at issue was associated with criminal activity. *See Murphy,* 261 F.3d at 744. Therefore, I **recommend** the District Court find that the incriminating nature of the sawed-off shotgun was immediately apparent to Deputy Omar. Accordingly, if Deputy Omar had the right to enter the trailer in the first place, he was lawfully in the position from which he viewed the shotgun and the gun need not be suppressed.

### 2. *Deputy Omar had the right to enter the trailer because he had third-party consent to enter.*

A warrant was not required to enter the trailer if Deputy Omar had valid consent to enter to extinguish the candle. *See United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006) (noting that "[c]onsent is a valid exception to the warrant requirement") (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). Officers may rely on the consent of a third party if, given the totality of the circumstances, they reasonably believe the third party has the authority to consent. *Id.* at 668 (citations omitted). A third party need not actually have common authority over the property for the search to be constitutionally permissible. Instead, courts will uphold a search if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio,* 392, U.S. 1, 21-22 (1968)) (alteration in original).

Here, Deputy Omar asked James for permission to blow out the candle because he believed James would be unable to climb into the trailer, which was approximately 20 inches off the ground and then access the bunk, which was between three and four-and-one-half feet off the ground and which Deputy Omar had to access using a chair. (Omar Hr'g Test.; Gov. Ex. 4 at 00:15-30.) Officers testified that James was 81-years-

old; "he didn't get around well;" had knee and back issues; had difficulty walking and sitting, although he did not need assistance with those tasks; and in their opinions could not have accessed the candle without difficulty because he would have had to climb up on the bunk to blow out the candle. (Schmid Hr'g Test.; Steines Hr'g Test.; Gov. Ex. 2 at 5, 6.) Deputy Schmid testified in the following way:

> Q.  Based on your understanding and knowledge of the defendant's father's physical condition, would this have been something he could have easily done?
> A.  No.
> Q.  Do you think he could have done it?
> A.  Do I think the father could have? I – it is possible, but I don't believe so.

(Schmid Hr'g Test.) Deputy Steines testified to the following:

> A.  What would make the most sense or what I do is climb up on the bed bunk to access the candle.
> Q.  Would you be able to blow it out from the ground without being up on the bed?
> A.  I wouldn't think so.
> Q.  Based upon your understanding and knowledge of the defendant's father's physical condition as you witnessed, would this have been something defendant's father would have been able to do?
> A.  My opinion is that his father would definitely not have been able to climb up on that bunk and -- to be able to access blowing that candle out.

(Steines Hr'g Test.) Deputy Omar testified to the following:

> Q.  So when you went in to blow out the candle, what did you do?
> A.  The first attempt, as I stood next to the bunk, I attempted to blow it out. And I wasn't close enough. So then I had to step onto a chair that was near. And then I leaned in and blew out the candle.
> Q.  Based upon your understanding and knowledge of the defendant's father's physical condition which you witnessed, would this have been something Defendant's father could have done?
> A.  No.

(Omar Hr'g Test.)  Thus, deputies reasonably believed that James would not be able to put out the candle himself.  The question remains whether it was reasonable for them to believe James had authority to give Deputy Omar permission to enter the trailer and blow out the candle.

Defendant clearly gave James permission to "secure my trailer" when he was taken to the hospital.  (Gov. Ex. 5 at 24:49-50.)  As part of that permission, Defendant gave his father permission to enter the trailer to find a key and lock.  (*Id.* at 24:11-20.) Defendant argues that this permission did not equate to "common authority" over the trailer such that he had permission to grant Deputy Omar the right to enter the trailer to blow out the candle.  Defendant asserts that this is especially obvious in this case in which officers knew James lived in a home that was separate from the trailer, did not have his own key to the trailer, and because James stated that he had never been inside the trailer. (Doc. 39 at 6 (citing Gov. Ex. 4 at 1:43-50).)  For support, Defendant cites *United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008) for the proposition that "[Eighth Circuit] cases suggest that where a person exercises privileges that would only be proper for an occupant of the house, the police may draw the inference that the person is indeed an occupant unless there are other circumstances that would cause a reasonable man to doubt the validity of that inference."  (Doc. 31 at 5.)  Defendant avers that James "made no statements indicating that he had authority over the trailer. . . . [and] exercised no privileges that would only be proper for an occupant or possessor of the trailer."  (*Id.*)

I have found no case directly on point, but find *Alatorre* instructive.  2019 WL 5149971, at *9.  *Alatorre* addressed the authority of the driver of a car hauler to consent to the search of the interior of a Sport Trac truck he was hauling from California to Minnesota.  *Id.* at *1, *9.  While the driver did not own the Sport Trac, the owner gave him the key, the driver had the authority to drive vehicles on and off his carrier during the course of his work, and it was the driver's responsibility to secure the Sport Trac to

41

the carrier and move it on and off the carrier, which the court reasoned "show[ed] a significant degree of access and control." *Id.* Although the defendants argued that the bill of lading demonstrated that the driver lacked actual authority to consent to even a limited search of the interior of the Sport Trac because it only gave the driver permission to access the Sport Trac to silence an alarm or to store it pending payment, *Alatorre* held it nevertheless supported a finding that the driver "had a sufficient connection to the Sport Trac to have actual authority to consent to allowing another person access to the interior of the vehicle." *Id.* & n.8. *Alatorre* reasoned that nothing in the bill of lading limited the driver's access to the interior of the Sport Trac and the driver was allowed to enter the vehicle to use any means he deemed effective to disable the alarm, if necessary, which gave the driver the authority to allow someone to enter the Sport Trac to disable the alarm and even to use intrusive means to do so. *Id.* at *9-10.

In the alternative, *Alatorre* found that the driver had apparent authority to give consent to the search. *Id.* at 10.

> The facts available would have justified the belief of a reasonable officer in Trooper Parr's position that V.C. could consent to the testing of the tires and the entry into and search of the Sport Trac's interior cabin. At the time V.C. agreed to the search, Trooper Parr knew that V.C. was in sole possession of the Sport Trac; V.C. had a key to the vehicle; and V.C. could drive the vehicle on and off the trailer. Moreover, Trooper Parr had reviewed the bill of lading, which did not expressly limit V.C.'s access to the interior of the vehicle. Aware of these facts, a "person of reasonable caution [could be justified] in the belief that [V.C.] had authority over the item to be searched[.]" *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003) (citing *Rodriguez*, 497 U.S. at 188).

*Id.* (brackets in original).[21]

---

[21] *Alatorre* held that the driver's apparent authority did not extend to searches of the hidden compartments of the Sport Trac. No. 019CR00061ECTKMM, 2019 WL 5149971, at *11. The same is true in the instant case. James's authority only extended to allowing officers to "secure" Defendant's possessions, which under these facts means blowing out the candle.

Although there is no written authorization, Defendant orally granted James authority to secure his possessions when he was away in the same way as the owner of the Sport Trac granted the driver of the car carrier authority to secure the Sport Trac during its journey from California to Minnesota. Like the driver in *Alatorre* who had the key to the Sport Trac and authority to store it, James was told where to find the key and lock so he could store the trailer and its possessions. Therefore, James had the authority to grant Deputy Omar access to the trailer in the same way as the driver in *Alatorre* had the authority to grant law enforcement access to the Sport Trac. Although Defendant is correct that Deputy Omar did not give James the opportunity to try to extinguish the candle himself, that is not the legal standard. All three deputies testified that they did not believe James would be able to access the trailer and candle. Moreover, Deputy Omar asked James if he had permission to go into the trailer and blow out the candle. James had the option to say, "No." Instead, he said, "Go do it." (Gov. Ex. 4 at 00:29.)

Therefore, even if James did not have the authority of one who lived in the trailer, I find he had been granted limited authority to do what was necessary to keep the possessions in the trailer secure, including granting access to blow out a candle that threatened to start the contents of the trailer on fire. While Defendant's immediate concern when he was on his way to the hospital appeared to be theft, it was reasonable for officers to conclude that Defendant did not want his possessions or his trailer to start on fire, either.

Moreover, even if James did not have actual authority to grant Deputy Omar access to the trailer, I find he had apparent authority to do so.[22] Deputies heard Defendant

---

[22] The instant case calls to mind the problem of determining whether the owner of a motor vehicle can be liable under Iowa Code Section 321.493 for damages caused by a second permittee, i.e., a driver who did not have direct permission to operate a vehicle but did have permission from an intermediate permittee. The Iowa Supreme Court held:

give James authority to secure his trailer and possessions, including the authority to enter the trailer to find the lock and key and, assumedly, the authority to gather the possessions that were on the lawn and put them inside the trailer. Aware of these facts, a person of reasonable caution could be justified in the belief that James had authority over the trailer. *James*, 353 F.3d at 615 (citing *Rodriguez*, 497 U.S. at 188). Thus, this case presents a situation where James may not have exercised the privilege of an occupant of the trailer, but officers reasonably understood that under the circumstances Defendant gave James some limited privileges over the trailer. *See Almeida-Perez*, 549 F.3d at 1172. Moreover, the sentence following Defendant's citation from *Almeida-Perez* states, in pertinent part, "that it would be unjustifiably impractical to require the police to take

---

When ownership of a vehicle is admitted, a presumption is created that the vehicle was operated with the consent of the owner. *McKirchy v. Ness*, 256 Iowa 744, 747, 128 N.W.2d 910, 912 (1964). The inference of consent may be negated by proof that there was no consent. *Mitchell v. Automobile Underwriters*, 225 Iowa 906, 910, 281 N.W. 832, 835 (1938). As applied to a second permittee, this inference may be overcome by the owner's showing that the first permittee was not given express or implied authority to delegate permission for the vehicle's use. *Schneberger v. Glenn*, 176 N.W.2d 782, 785 (Iowa 1970). Generally, a factual determination must be made as to whether the initial grant of authority was broad enough to include an implied grant to give the second permittee authority to use the vehicle. *Id*. The inference may be overcome and the matter of consent determined as a matter of law when the undisputed and uncontroverted evidence conclusively establishes the facts. *Moritz*, 437 N.W.2d at 900 (citing *Curry v. Bickley*, 196 Iowa 827, 832, 195 N.W. 617, 619 (1923)).

*Van Zwol v. Branon*, 440 N.W.2d 589, 591–92 (Iowa 1989). Thus, under Iowa law, there is at least a presumption that someone given control over a motor vehicle (at least for the purposes of determining liability to third parties) is authorized to yield that control to others. Here, the evidence establishes that Defendant authorized James to assert some control over the trailer in securing it. There is no evidence that would support a limitation on that authority to prevent him from engaging the assistance of others. To the contrary, James's physical condition likely necessitated such assistance. At no time did Defendant attempt to limit his father's ability to enlist law enforcement or other third parties in this endeavor.

affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent." 549 F.3d at 1171 (citations omitted). Here, it would have been most impractical to track down Defendant at the hospital to determine whom he wanted to extinguish the candle when deputies heard him designate James to secure his trailer. Thus, this was not a typical situation in which officers were met with someone who gave the officers access to a property and officers trusted the person's representation that he or she had common authority over the property. *See, e.g.*, *Rodriguez*, 497 U.S. at 179-80 (woman who had not lived with defendant for a month, but had a key to his apartment, gave officers access to defendant's apartment).

I **recommend** the District Court find that Deputy Omar's entry into the trailer was justified because he had third-party consent.

### 3. *Deputy Omar's entry into the trailer was justified under the community caretaking exception to the warrant requirement.*

Under the community caretaking exception to the warrant requirement, an officer may enter a premises without a warrant if the officer possesses a "reasonable belief that an emergency exists requiring his or her attention." *United States v. Quezada*, 448 F,3d 1005, 1007 (8th Cir. 2006). Reasonable belief "is a less exacting standard than probable cause." *Id.* (citing *Maryland v. Buie,* 494 U.S. 325, 336–37 (1990)). Here, even if none of the other reasons previously discussed justified Deputy Omar's entry into the trailer, the Government proffers that his entry to extinguish the candle was justified in his role as a community caretaker because had he not blown out the candle, "the candle would possibly start the trailer on fire and we would be responding to a trailer fire then." (Omar Hr'g Test.)

Defendant asserts that a neighbor "who had known [Defendant] for many years was present at the scene," and should have been allowed to enter the trailer to blow out the candle or that James should have been allowed to try and blow out the candle himself

before Deputy Omar asked if he should blow it out. First, there is no law stating that officers must ask a neighbor to enter the premises before they do, especially when officers believe there are firearms present. Second, as discussed above, officers reasonably determined that James could not physically access the trailer. Based on that assessment, Deputy Omar asked and was granted permission to enter the trailer. *See United States v. Weston*, 443 F.3d 661, 668 (8th Cir. 2006) ("On review, we ask this question: would the facts available to the officer at the time the [third-party] consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched?"). Third, just as the Government stated, it was necessary to extinguish the candle to prevent a fire and the destruction of Defendant's property. In addition, it was necessary to insure the candle was extinguished given the location of the trailer in a residential neighborhood surrounded by downed branches and other debris from the derecho that would have provided fuel for any fire that might have started, notwithstanding the damage to Defendant's property. (Gov. Ex. 5 at 00:36-49; 3:05-7:00 (video showing branches and storm debris).)[23] Therefore, I **recommend** the District Court find that Deputy Omar's entrance into the trailer was also justified as a community caretaking function.

### F. If the District Court decides that the warrant was valid, evidence seized under the warrant should not be suppressed, even if the District Court determines that Deputy Omar's entry into the trailer to blow out the candle was unconstitutional.

The inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without an unconstitutional violation. *Utah v. Strief,* 136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams,* 467 U.S. 431, 443-44 (1984)); *Hogan v.*

---

[23] On August 17, 2020, the City of Cedar Rapids expanded its ban on burning debris to include a ban on recreational fires.
https://twitter.com/cityofcriowa/status/1295410239655882756?s=21

*Kelley,* 826 F.3d 1025, 1028 (8th Cir. 2016). For the inevitable discovery doctrine to apply, the Government must prove not only that the evidence would have been discovered by lawful means, but also that the officers were "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* (citing *United States v. McManaman,* 673 F.3d 841, 846 (8th Cir. 2012)). For example, in *McManaman,* the Eighth Circuit held that child pornography seized in a search of defendant's home did not have to be suppressed because drug paraphernalia found on the defendant's person when he was arrested would have given officers enough probable cause to get a search warrant that would have ultimately led to the discovery of the pornography. 673 F.3d at 847-48.

The warrant Application and Affidavit do not mention the sawed-off shotgun Deputy Omar saw when he entered the trailer to blow out the candle. Therefore, if the District Court decides the warrant was valid, but decides that Deputy Omar's entrance into the trailer was unconstitutional, evidence seized pursuant to the warrant, including the sawed-off shotgun, should not be suppressed. Contrary to Defendant's argument that "there is no evidence that officers were going to get a search warrant until after Deputy Omar unlawfully entered the trailer and saw the modified shotgun [or that] [l]aw enforcement was not pursuing a 'substantial, alternative line of investigation at the time of the constitutional violation'" (Doc. 31 at 7 (citation omitted)), Deputy Schmid testified that officers would have sought a warrant even had they not known about the sawed-off shotgun because Defendant said he had a shotgun and that gun had not been located. (Schmid Hr'g Test.) He also testified that "[w]ith drugs and guns combined, that elevated the need to get a search warrant." (*Id.*) In addition, all three deputies testified that when there is evidence of one gun, they always look for others and when there is evidence of marijuana, they always look for more narcotics and paraphernalia because there usually are more guns or illegal narcotics and paraphernalia present in those situations. (Schmid

Hr'g Test.; Steines Hr'g Test.; Omar Hr'g Test.) Thus, officers were investigating the alternative line of investigation related to the guns and drugs they knew Defendant possessed at the time he was taken into custody, which had nothing to do with the sawed-off shotgun Deputy Omar first saw when he blew out the candle on Defendant's bunk. Therefore, I **recommend** the District Court find that evidence seized pursuant to the warrant need not be suppressed, even if the Court finds that Deputy Omar's entrance into the trailer to blow out the candle was unconstitutional.

G.     *None of the evidence seized is fruit of a poisonous tree*.

Defendant makes the cursory argument that "but for Deputy Omar's unlawful entry into [Defendant's] trailer, a search warrant would not have been obtained, and the modified shotgun and ammunition would not have been seized." (Doc. 31 at 8.) Thus, Defendant argues that "[t]he search warrant, shotgun, and ammunition are all fruits of the poisonous tree and the shotgun and ammunition should be suppressed." (*Id.*)

Evidence acquired through a source independent of the taint of a constitutional violation is admissible. *Wong Sun v. United States*, 371 U.S. 471, 487-89 (1963). "A warrant obtained after an illegal search is not an independent source if either of the following are true: if the agents' decision to seek the warrant was prompted by what they had learned" as a result of the unconstitutional search, and if information obtained during that unconstitutional search was presented to the judge and affected the judge's decision to issue the warrant. *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

For the reasons discussed above, specifically the alternate constitutional ways in which Deputy Omar gained access to the trailer and because officers did not rely on the presence of the sawed-off shotgun as a basis for the warrant, I **recommend** the District Court find that any evidence seized from the trailer was not fruit of a poisonous tree.

48

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant's Motion to Suppress. **(Doc. 30.)**

**To allow for an expedited final ruling**, objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) must be filed within **SEVEN (7) days** of the service of a copy of this Report and Recommendation. *See United States v. Vasquez-Martinez*, No. 6:05CR60016-001, 2006 WL 376474, at *8 (W.D. Ark. Feb. 9, 2006) (seven days for objections); *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 925 (D. Minn. 2018) (referral order included order for expedited review of R. & R.).

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 11th day of January, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

49