**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | No. 20-CR-90-CJW-MAR | |
| vs. | **ORDER** | |
| PHILIP MACCANI, | | |
| Defendant. | | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................. 3

II.     STANDARD OF REVIEW.................................................... 3

III.    FACTUAL BACKGROUND ............................................... 6

IV.     ANALYSIS.......................................................................... 17

      A.      Sufficiency of the Search Warrant ............................. 18

           1.      Probable Cause................................................ 18

                a.      The Search Warrant Application................ 19

                b.      Defendant's First Argument ..................... 21

                c.      Defendant's Second Argument .................. 24

           2.      Particularity.................................................... 29

      B.      *Leon* Good Faith Exception ...................................... 32

C.     Automobile Exception……………………………………………34

D.     Deputies' Authority to Enter the Trailer …………………………44

     1.     Third Party Consent……………………………………44

     2.     Community Caretaking Exception  ………………………46

E.     Plain View Exception ……………………………………………47

F.     Inevitable Discovery……………………………………………49

G.     Fruit of the Poisonous Tree ………………………………………52

V.     CONCLUSION ………………………………………………………53

# I. INTRODUCTION

This matter is before the Court on defendant's Objections (Doc. 43) to the Report and Recommendation ("R&R") (Doc. 42) of the Honorable Mark A. Roberts, United States Magistrate Judge. On December 10, 2020, defendant filed a Motion to Suppress. (Doc. 30). The government timely filed a resistance. (Doc. 36). On December 21, 2020, Judge Roberts held a hearing on the motion and requested supplemental briefing from the parties. (Doc. 37). On December 28, 2020, both parties filed their supplemental briefs. (Docs. 38 & 39). On January 11, 2021, Judge Roberts issued his R&R, which recommends that the Court deny the Motion to Suppress. (Doc. 42). On January 19, 2021, defendant timely filed his objections to the R&R. (Doc. 43).

For the following reasons, the Court **sustains in part and overrules in part** defendant's objection No. 1, **overrules** defendant's objections Nos. 3–11, **adopts** Judge Roberts' R&R with factual modification, and **denies** defendant's Motion to Suppress.

# II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

3

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo.  28 U.S.C. § 636(b)(1).  In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate."  *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter.  *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 618–19 (2004) (noting de novo review is "distinct from any form of deferential review").  The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'"  *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))).  Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made.  28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review."  *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989).  Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]."  *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994).  As a result, the Eighth Circuit Court of Appeals has

4

concluded that general objections require "full de novo review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

5

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III. FACTUAL BACKGROUND

Defendant objects to several of Judge Roberts' factual findings. Specifically, defendant objects to the findings that (1) more than one container of alcohol was in plain view when officers arrived, (2) law enforcement officers were able to determine that defendant was intoxicated, (3) officers were able to determine that the orange prescription bottle contained marijuana, (4) Deputy Steines could see a shotgun in defendant's hand, and (5) any law enforcement officer could see a handgun in the small of defendant's back. (Doc. 43, at 1).

After reviewing the record—including the hearing transcripts and video evidence— there is merit to some of defendant's objections. Judge Roberts found that officers could see multiple "empty alcoholic beverage containers in plain view." (Doc. 42, at 6). The

record reflects that during the investigation of the scene officers discovered multiple empty beer cans in a small cooler near the entrance of the trailer, and a bottle of alcohol on the ground next to the cooler. (Doc. 36-2, at 2). Government Exhibit 2 includes pictures of the cooler both opened and closed, with items around the cooler present in some pictures but not others. (*Id.*, at 2–4). Neither the sequence of the photographs in Exhibit 2 nor the timing of each picture as it relates to the government's investigation of the scene is clear. Video evidence from the scene, however, shows that the cooler was closed before officers began processing evidence. Gov't Ex. 5, at 26:38. Thus, the Court finds that the only alcoholic beverage container in plain view during the officers' initial interaction with defendant was the single bottle of alcohol. Defendant's objection on this ground is **sustained**.

Judge Roberts found that defendant was intoxicated at the scene. (Doc. 42, at 6). Defendant objects to this finding (Doc. 43, at 1), presumably on grounds that officers were not able to conclusively determine that defendant was intoxicated as opposed to suffering from a mental health problem. (*See* Doc. 47, at 78-80). There is ample testimony to support the responding officers' belief that defendant was intoxicated. Officers described defendant as erratic, thick-tongued, agitated, and having slurred speech. (Doc. 47, at 16, 68–69, 96). After watching body camera footage of defendant's interactions with officers that night, the Court agrees with Judge Roberts' statement earlier in the R&R that defendant appeared to be intoxicated. (Doc. 42, at 5 n.5). In this case, to quibble over whether defendant *appeared* intoxicated versus whether he *was* intoxicated may be a distinction without a difference. It is a distinction nonetheless and the Court, no less than defendant, has an interest in establishing an accurate and precise record. The facts as recited by the Court will therefore reflect this distinction; the Court finds defendant appeared intoxicated. Defendant's objection on this ground is **sustained**.

Judge Roberts found that officers observed "an orange prescription-type bottle containing a green leafy substance" in plain view and that officers believed that this bottle contained marijuana. (Doc. 42, at 8). Defendant objects to this finding, again seemingly taking issue with the certitude conveyed by Judge Roberts' finding. (Doc. 43, at 1). Judge Roberts made no finding as to what was actually in the bottle. Rather, Judge Roberts clearly specified that the officers believed that the green leafy substance was marijuana based on their training and experience. (Doc. 42, at 8). The Court finds no factual error here and defendant's objection on this ground is **overruled**.

Defendant's final two factual objections are intertwined and deserve greater attention. Judge Roberts found that, as the deputies were approaching the trailer, Deputy Steines saw defendant standing in the doorway of the trailer with a shotgun in his hand. (Doc. 42, at 5). Judge Roberts also found that Deputy Pritchard saw "something small, dark or black" in the small of defendant's back.[1] (*Id.*). At the December 21, 2020 suppression hearing, Deputy Steines testified that Deputy Schmid made initial contact with defendant. (Doc. 47, at 62). When asked what he saw when he arrived on scene, Deputy Steines replied

> Immediately when I got to the scene, I didn't see anything. So I began walking around the front yard of the reporting party's house. And while walking around the front yard, I'd heard Deputy Schmid and Mr. Maccani exchange what I would call pleasantries, if you will, which drew my attention over to Mr. Maccani and his trailer.

(*Id.*). When asked what he meant by "pleasantries," Deputy Steines explained that he was referring to "just a brief, Hey, how are you doing kind of thing" between Deputy

---

[1] In a technical sense, Judge Roberts found that Deputy Steines testified that Deputy Pritchard saw something in the small of defendant's back, not that Deputy Pritchard actually saw something. (Doc. 42, at 5). A strictly literal reading of the R&R in this context would be inconsistent with the surrounding facts and Judge Roberts' subsequent analysis. The Court therefore adopts the more reasonable interpretation of the R&R described above.

Schmid and defendant. (*Id.*). Deputy Steines then testified that he first visually observed defendant outside of his trailer without a firearm, but that Deputy Pritchard, who was next to Deputy Steines, observed the "small, dark or black" object believed to be a gun. (*Id.*, at 64). According to Deputy Steines, Deputy Schmid ordered defendant to show his hands and defendant refused. (*Id.*, at 65). When Deputy Schmid asked why he would not show his hands, defendant responded that it was because he had a shotgun in his hand. (*Id.*). Deputy Schmid ran back to his squad car to retrieve his service rifle, during which time defendant retreated into the trailer briefly and reemerged a moment later without a shotgun. (*Id.*, at 66). It was during the interaction between Deputy Schmid and defendant that Deputy Steines reportedly observed defendant holding a shotgun "[a]long his side in his hand." (*Id.*, at 64).

Deputy Steines' testimony at the suppression hearing differs somewhat from his prior testimony at defendant's detention hearing on November 3, 2020. There, Deputy Steines also testified that he first saw defendant "standing outside of a homemade travel trailer." (Doc. 18, at 5). The following exchange occurred at the detention hearing:

| Gov't: | Now, what was Mr. Maccani doing at this point besides standing outside at this trailer? |
|---|---|
| Steines: | I don't—essentially just pretty much standing there. And while standing there, my attention was drawn that it appeared that he was holding a shotgun or a long-type gun in his hand along—along his side. |
| Gov't: | Were you—when you arrived at the scene, were you alone? |
| Steines: | No, ma'am. |
| Gov't: | And did you have back up with you? |
| Steines: | Yes, ma'am. |

| Gov't: | And did you let the person that you were with, the officer that you were with, know that you believed Mr. Maccani was holding a firearm? |
| --- | --- |
| Steines: | Yes, ma'am. |
| Gov't: | And what does that entail? How do you tell each other that? |
| Steines: | I communicated over our radio, and I informed the assisting deputy that I believe the subject had a possible 10-32 which is 10 code for firearm, and I repeated that a couple of times over the radio to inform the other deputy of safety precaution. |

(*Id.*, at 6–7).

The video evidence of the interaction gives the Court reason to doubt the clarity of Deputy Steines' recollection of events at the suppression and detention hearings. Deputy Schmid's camera clearly shows defendant inside the trailer or leaning out of the trailer when they begin speaking. Gov't Ex. 5, at 00:40–00:50. Defendant was neither standing outside of the trailer nor standing fully visible in the doorway. Defendant's right arm remained inside the trailer and out of sight during the entire interaction. Deputy Schmid asked defendant to see his hands, at which point defendant admitted to having a shotgun in his other hand. It was only at this point that Deputy Steines declared "10-32," indicating the presence of a firearm. No mention of a firearm was made prior to defendant admitting that he was holding a firearm. Deputy Steines was standing some distance to Deputy Schmid's right and had a different angle of observation than Deputy Schmid. It is certainly possible that Deputy Steines did observe defendant holding something and—given defendant's admission and the subsequent discovery of the shotgun in the trailer—it is certainly possible that defendant was in fact holding the shotgun. Whether Deputy Steines actually recognized the object as "a shotgun or long-type gun" in the moment is a separate question, however, and is answered to some extent by further testimony from Deputy Steines at the detention hearing.

| Gov't: | At some point did Mr. Maccani agree to kind of come out, step away from the trailer to speak with law enforcement? |
|---|---|
| Steines: | After the realistic discovery that Mr. Maccani most likely, in fact, was indeed armed with a gun, thought to be a shotgun, Deputy Schmid left momentarily, went back to his marked patrol vehicle, retrieved his rifle. And during this time I remained under cover concealment behind a tree adjacent to the doorway, and at one point in time I believe it was the reserve deputy that was with me [Deputy Pritchard] said something to the effect of can you—can you put the shotgun down or away or something to that effect so we can talk. And Mr. Maccani went back into the trailer and got rid of whatever was in his hand and came back out. |

(Doc. 18, at 8).

Deputy Steines waited until after defendant admitted to holding a shotgun to declare "10-32," rather than immediately alerting the other deputies to the presence of a firearm the moment he said he observed it. Deputy Steines also described the moment that Deputy Schmid left to retrieve his service rifle as the point when he realistically believed that defendant was armed, inferring that he did not believe defendant to be armed prior to that moment. These facts, coupled with Deputy Steines' mis-recollection of defendant's physical location upon first observation, casts a shadow over his overall recollection of events in those tense initial moments. Memory is a tricky thing, particularly when the mind is tired and events are unfolding rapidly. Deputy Steines undoubtedly related events as he remembered them. If Deputy Steines saw anything in defendant's hand prior to defendant's admission, however, it cannot be said that he knew it to be a firearm based on the record in this Court. Defendant's objection on this ground is **sustained** and the facts recited by the Court will so reflect.

Further, there is no indication that Deputy Steines or Deputy Pritchard observed a handgun in the small of defendant's back until after Deputy Schmid returned with his service rifle. It may very well be that Deputy Pritchard observed "something small, dark

Case 1:20-cr-00090-CJW-MAR   Document 57   Filed 03/12/21   Page 11 of 53

or black" in the moments between first spotting defendant and defendant's admission that he was holding a shotgun. As there is no body camera footage from either Deputy Steines or Pritchard in evidence, it is impossible to know for sure what they observed. That neither deputy immediately recognized or suspected that the object was a firearm is again evidenced by the fact that Deputy Steines did not alert fellow deputies to the presence of a firearm until after defendant's admission.

The testimony elicited at the suppression hearing does not clarify exactly what happened to the "small, dark or black" object in the small of defendant's back. Deputy Steines testified that Deputy Pritchard alerted him to the object, but made no further mention of the object until describing a pistol found in plain view in the doorway of the trailer that Deputy Steines described as having "been previously in the small of [defendant's] back." (Doc. 47, at 72). At defendant's detention hearing, however, Deputy Steines testified that once defendant admitted to holding a shotgun, Deputy Pritchard attempted to talk to defendant and convince him to put down the shotgun while Deputy Schmid returned to his patrol vehicle to retrieve his service rifle. (Doc. 18, at 8). According to this testimony, defendant then disappeared into the trailer and reemerged a moment later without a shotgun or long gun. (*Id.*). Defendant stepped out of the trailer and turned to walk towards the rear of the trailer where Deputy Schmid had previously been. (*Id.*, at 8–9). When defendant turned, "he gave up the vantage point of his back side," allowing Deputy Steines to "observe what [he] believed to be a handgun tucked in the small of [defendant's] back." (*Id.*, at 9). Deputy Steines ordered defendant to put the weapon down and Deputy Pritchard ordered defendant not to move and show the deputies his hands. (*Id.*, at 9). Defendant then removed the handgun from his waistband, placed it on the floor in the doorway of the trailer, and stepped away from the trailer and out into the grassy area next to the trailer. (*Id.*).

This version of events is largely corroborated by Deputy Schmid's body camera footage. Gov't Ex. 5. The video does not visually capture much of the exchange as described above because Deputy Schmid had returned to his patrol vehicle to retrieve his service rifle. Once Deputy Schmid returned to the vicinity of the trailer, however, defendant can be heard speaking to deputies. Deputy Schmid asked another deputy near him, "Is it behind his back?" *Id.*, at 5:45. An unknown deputy can then be heard shouting "He's got a gun behind his back, man." *Id.*, at 5:48. Multiple deputies, including Deputy Schmid, then yell "Don't reach for it!" *Id.*, at 6:00. Defendant responds with several expletives and a profanity-laden diatribe about his rights as an American citizen. *Id.*, at 6:02–6:18. During this diatribe defendant informed the deputies that he "just put it on the floor" and that he had "a permit for that, concealed carry." *Id.* From Deputy Schmid's vantage point defendant can be seen bent over near the door of the trailer, placing something on the floor in the doorway of the trailer, and then walking out into the grassy area next to the trailer. *Id.*, at 6:10–7:00.

Based on Deputy Steines' testimony at the suppression hearing and the detention hearing, as well as Deputy Schmid's body camera footage, the Court finds that deputies did see "something small, dark or black" in the small of defendant's back, but did not immediately recognize it to be a handgun. Once defendant came out of the trailer without a long gun, however, Deputies Steines and Pritchard positively identified the object in defendant's waistband as a handgun and their actions accord with that identification. Accordingly, defendant's objection on this ground—that no deputy could see a small handgun in the small of defendant's back—is **overruled**.

A case such as this is necessarily fact-intensive, and a sound analysis depends on a thorough and accurate recitation of the facts. Notwithstanding the three factual objections the Court sustains, Judge Roberts accurately and thoroughly summarized the

relevant facts in his R&R. (Doc. 42, at 3–10). Thus, the Court adopts and incorporates the R&R's factual findings with the modifications as discussed above.

Just before 1:00 a.m. on August 17, 2020, Deputy Dylan Schmid was dispatched to a residence for "subject in the roadway who was causing disturbance." Deputy Schmid arrived simultaneously with [Deputy Steines and Deputy Pritchard] at a cul-de-sac and found a large licensed trailer that appeared to be capable of being pulled behind a motorized vehicle. The trailer was not attached to such a vehicle, but was parked behind a licensed truck with a trailer hitch suitable for towing it. The truck was parked in front of the trailer. The trailer hitch rested on a block, wheel chocks blocked the tires, and solar panels leaned against the back of the trailer and were attached to the trailer with electric cables. The truck and trailer were parked on the public street in front of the lot associated with house number 41[xx], which was adjacent to the lot associated with house number 41[xy]. A lawn chair and a large water bottle were on the lawn beside the trailer.

Upon arrival, two deputies began walking down the driveway of house 41[xx], when Deputy Schmid noticed an individual at the threshold of the side door of the trailer. Deputy Schmid told the man, later identified as defendant, they were responding to a call about a man yelling in the street, and defendant began a disjointed and expletive-laden discussion about how angry he was that someone was running a generator while he was trying to play his guitar. Deputy Schmid ordered defendant to show both his hands, because his right hand was not visible to Deputy Schmid. Defendant refused, stating he had a shotgun in his hand, which Deputy Schmid could not see. At that point, Deputy Steines shouted "10-32." Deputy Schmid retreated to his patrol vehicle, told his fellow officers to "get cover," and retrieved his rifle from his vehicle.

After Deputy Schmid retrieved his rifle, he took cover by a patrol vehicle, while Deputy Steines stationed himself behind a tree to speak to defendant. [While Deputy Schmid was retrieving his service rifle], defendant remained agitated, continuing his animated discourse. Deputy Pritchard told defendant that if he put down the weapon, the officers would go over and talk to defendant. Deputy Steines saw defendant retreat out of sight into the trailer and then emerge onto the grass without a gun in his hands. [As defendant turned to face the rear end of the trailer, Deputy Steines testified that he and Deputy Pritchard saw a handgun in the small of defendant's back, tucked into his waistband.] When Deputy Schmid approached defendant again, he noticed that defendant did not have a gun

14

in his hand and was standing outside of the trailer. Both Deputy Schmid and Deputy Steines testified that defendant had the time to throw the subsequently discovered shotgun onto a bunk located in the rear of the trailer, a distance of approximately three-to-four feet, and that there was nothing impeding such a throw. Deputy Omar also testified that it would have been possible to throw a sawed-off shotgun from the door of the trailer to the bunk with one arm.

Defendant [appeared to be] intoxicated as evidenced by his admission that he had been drinking, his "highly agitated" behavior, mumbled and slurred speech, thick tongue, argumentative behavior, and illogical conversation. In addition, there [was a bottle of alcohol on the ground near the trailer in plain view.] Deputies tried for several minutes to deescalate the situation before Deputy Schmid was able to sweep defendant's legs and bring him to the ground. It took several officers to subdue defendant and handcuff him. [While some deputies were subduing defendant, Deputy Omar conducted a protective sweep of the trailer to ensure there were no other people inside who may present a threat to the deputies present.]

Defendant was then arrested and placed in the rear of a patrol car where he proceeded to bang his forehead against the Plexiglas between the front and back seats of the car. Defendant cut his forehead and was bleeding, officers wanted to remove him from the car so paramedics could tend his wounds, and Defendant wanted to speak to his father before being treated. A deputy placed an apparently breathable bag over defendant's head so law enforcement could interact with Defendant without being spat on. Officers also wanted someone to secure defendant's trailer and his property.

Deputy Omar, who had arrived on the scene "a couple minutes or so" prior to defendant being taken into custody, and another officer went to defendant's father's residence, which was next door at number 4140, to get defendant's father, James Maccani ("James"). Officers wanted James to calm defendant down and to secure defendant's trailer. When he was walking down James's long driveway to the scene, Deputy Omar noticed that James was somewhat unsteady on his feet and that walking down the hill was "kind of difficult for him." James also stated he had a knee issue and back issue. Deputy Omar offered James his arm for support, but James declined. Defendant told officers that his father was 81-years old and had trouble walking. Defendant was eventually convinced to go to the hospital for treatment and left the scene in an ambulance. Before he left for the hospital, defendant told James where he could find the keys and lock to his

trailer hanging inside the trailer and asked James to secure the trailer for him because he was worried someone would steal his possessions.

After Defendant was taken to the hospital, deputies began to process the scene. Officers noted items that were in plain view including a Kel Tec handgun that was lying in the open doorway to the trailer, a bandolier containing 12-guage shotgun shells that was located in the lawn chair outside of the trailer, and an orange prescription-type bottle containing a green leafy substance officers believed, based on their training and experience, contained marijuana that was also found on the threshold to the trailer. Officers explained that while merely possessing a firearm is not illegal in the state of Iowa, possessing a firearm while being intoxicated is illegal.

Officers also had to secure Defendant's trailer. As part of that process, they had to blow out a candle Deputy Omar had noticed previously when he did his protective sweep of the trailer. Although the candle was in a candle holder, the candle, itself, had an open flame. The candle was located on a notebook on the bunk inside the trailer. The bunk was located in the back section of the trailer, to the left of the open door described above. Deputy Omar estimated that the bunk started at the wheel well and reached to [the] back end of the trailer. The bunk appears to run the entire width of the trailer. The trailer's ceiling is raised at that point and deputies estimated that the bunk was between three and four-and-one-half-feet off the floor of the trailer. Deputy Omar asked permission from James to enter the trailer and blow out the candle because defendant "put the possession of the trailer into his father's possession at the time before he went to the hospital" and because officers did not "think James was able to climb up to blow out the candle himself.

Once he received permission [from James], Deputy Omar entered the trailer to blow out the candle. Deputy Omar first unsuccessfully tried to blow out the candle while standing at the side of the bunk, but discovered he was not close enough. He had to step on a chair and lean in to blow out the candle. When he was in the trailer to blow out the candle, Deputy Omar saw contraband in plain view: the handgun with the safety off in the doorway of the trailer, a sawed-off shotgun on the bunk, and what Deputy Omar thought was a camouflaged rifle on the bunk. It was [ ] illegal for defendant to possess the handgun and the rifle at that time [only] due to his [apparently] intoxicated state, but it is always illegal to possess a short-barreled shotgun in Iowa. Prior to entering the trailer, Deputy Omar saw the prescription container containing the green leafy substance that Deputy

16

Omar suspected was marijuana and the bandolier with shotgun shells outside the trailer. After Deputy Omar blew out the candle, officers secured the trailer and applied for a search warrant for the trailer. The warrant application was written and submitted by Deputy Schmid and signed by Judge Cynthia S. Finley. Pursuant to the search of the trailer, officers seized the sawed-off shotgun, the suspected camouflaged rifle, and ammunition.

*Id.* (citations to record and footnotes omitted).

## IV. ANALYSIS

Judge Roberts found that the search warrant established probable cause and was sufficiently particular so as to satisfy the Fourth Amendment. (*Id.*, at 10–22). Judge Roberts also found that even if the warrant was constitutionally deficient, the subsequent search of defendant's trailer was lawful under both the *Leon* good faith exception and the automobile exception to the Fourth Amendment's warrant requirement (*Id.*, at 23–36), and that the seizure of defendant's shotgun was justified under the plain view doctrine. (*Id.*, 36–48). Judge Roberts concluded by finding that none of the evidence seized was fruit of the poisonous tree and recommending that defendant's motion to suppress be denied. (*Id.*, at 48-49).

In addition to the factual objections discussed above, defendant raised the following objections to the R&R: (1) the recommendation that the search warrant application or attachments established probable cause for a search, (2) the conclusion that the search warrant described items to be seized with sufficient particularity, (3) the recommendation that defendant's motion be denied with respect to the search warrant, (4) that the *Leon* good faith exception applies to the execution of the search warrant, (5) the recommendation that the automobile exception applies to the search of defendant's trailer, (6) the finding that the deputies had authority to enter the trailer and seize the shotgun under the plain view doctrine, (7) that the inevitable discovery doctrine applies, and (8) that none of the evidence seized was fruit of the poisonous tree. (Doc. 43, at 3-

9).  Lastly, defendant objects to the recommendation that his motion to suppress be denied.  (*Id.*, at 9).

### A.     *Sufficiency of the Search Warrant*

Judge Roberts found that the search warrant contained sufficient information to allow the issuing magistrate to determine the existence of probable cause.  (Doc. 42, at 15–20).  Judge Roberts also found that the warrant contained sufficient particularity "to allow officers to know the scope of a permissible search and the items they could legally seize under the warrant."  (*Id.*, at 22) (citation omitted).  Defendant objects to each of these findings as well as to Judge Roberts' ultimate recommendation that defendant's motion be denied with respect to the search warrant.  (Doc. 43, at 3-5).  The Court will address these three objections together.

#### 1.     *Probable Cause*

To be constitutionally valid, "a search warrant must be supported by a showing of probable cause."  *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007) (citing *United States v. Underwood*, 364 F.3d 956, 963 (8th Cir. 2002)).  Probable cause exists if, based on the totality of the circumstances, a showing can be made "sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002).  Judges are entitled to "draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant."  *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted).  "[T]he probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted).  "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required."  *United States v. Winarseke*,

715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1948) (internal citations and quotations omitted).

"A[n] [issuing] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotations omitted). The standard of review applied by reviewing courts is therefore far less than *de novo*. A court "should uphold the decision to issue the warrant so long as it is supported by substantial evidence on the record." *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (internal quotations omitted). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (internal quotations omitted). Thus, a warrant must be upheld so long as the affidavit—considered in its entirety—contains sufficient facts to establish a fair probability that contraband will be discovered in a particular place.

### a. *The Search Warrant Application*

The application for the warrant submitted by Deputy Schmid consisted of an affidavit and two attachments. (Doc. 31-1, at 9-15). The text of the affidavit was as follows:

> Being duly sworn, I, the undersigned, say that at the place (and on the person(s) and in the vehicle(s) described as follows:
>
> A tan box trailer located in front of the residence of 41[xx] Elkhorn Drive Cedar Rapids, IA with a license plate [omitted]. The trailer is registered to Phillip James Maccani [date of birth omitted] and has a Vehicle Identification Number of [omitted].
>
> in Linn County, there is now certain property, namely:

Deputy Stienes [sic] [badge number omitted] of the Linn County Sheriff's Office observed Phillip James Maccani [date of birth omitted] possess in his hands a long gun. Mr. Maccani then put the gun in his trailer located in front of 41[xx] Elkhorn Drive and he also tossed an object further into the trailer. Mr. Maccani was intoxicated at the time of the confrontation with Linn County Sheriff's Deputies. From the open door of the trailer I observed a bottle with a green leafy substance believed to be marijuana. A bandoleer [sic] with shotgun rounds was located in a chair directly outside the trailer door.

which is:

( ) Property that has been obtained in violation of law.
(XX) Property, the possession of which is illegal.
(XX) Property used or possessed with the intent to be used as the means of committing a public offense or concealed to prevent an offense from being discovered.
(XX) Property relevant and material as evidence in a criminal prosecution.
( ) A person for whom an arrest warrant has been issued.

The facts establishing the foregoing ground(s) for issuance of a search warrant are set forth in the Attachments which are made part of this Affidavit.

(*Id.*, at 9-10). The affidavit was then signed by Deputy Schmid and the magistrate and dated August 17, 2020. (*Id.*).

In Attachment A, Deputy Schmid first listed his identifying information and professional experience, including 10 years of service as a deputy. (*Id.*, at 11). Immediately below that, Deputy Schmid re-typed his most recent professional experience. He then stated in the next paragraph

Based on the aforementioned facts, and at the request of the Linn County Attorney, I respectfully request that a warrant be issued in support of the Linn County Sheriff's Office investigation into possible violations of state law, it is believed that evidentiary items

of multiple firearms, offensice [sic] weapons and illegal narcotics are believed to be [sic] contained inside a tan box trailer located in front of the residence of 41[xx] Elkhorn Drive Cedar Rapids, IA with license plate [omitted].

(*Id.*).  Attachment B contained options an applicant may select if they are relying on information from a confidential informant.  Deputy Schmid left these pages blank.  (*Id.*, 13–15).

Based on this information, a state magistrate judge granted the search warrant.[2] (*Id.*, at 16–17).  The search warrant itself contained a nearly verbatim recitation of the information included in the application.  (*Id.*, at 16).  The search warrant was returned executed at 5:13 AM on August 17, 2020.  (*Id.*, at 18).

### b. *Defendant's First Argument*

Defendant first argues that the only language in the application that might establish probable cause is contained in the fourth paragraph of the affidavit, but that "it is not at all clear that the facts set forth in this paragraph are what Deputy Schmid was relying upon when seeking the issuance of the search warrant." (Doc. 31, at 9-10).  In support of this argument, defendant first points to the language at the end of the affidavit stating, "[t]he facts establishing the foregoing ground(s) for issuance of a search warrant are set forth in the Attachments which are made part of this Affidavit." (*Id.*)  Defendant then notes that Attachment A does not contain any facts establishing the grounds for issuance, but rather contains only a "conclusory statement" that items of evidentiary value will be discovered in defendant's trailer.  (*Id.*).  Finally, defendant notes that the only portion of the application that might contain sufficient facts is the fourth paragraph of the affidavit,

---

[2] The judge signed the warrant itself, but dated it as August 15, 2020, rather than August 17, 2020.  (Doc. 31-1, at 17).  Neither party addressed this discrepancy.  The Court thus assumes it to be an unintentional and immaterial typographical error.

Case 1:20-cr-00090-CJW-MAR   Document 57   Filed 03/12/21   Page 21 of 53

and since that paragraph is not included as part of the attachments, it is unclear that Deputy Schmid was relying on it as grounds for seeking issuance of the warrant.

Judge Roberts found, contrary to defendant's argument, that the fourth paragraph of the affidavit was in fact incorporated into the attachments because the second paragraph of Attachment A begins with the language "[b]ased on the aforementioned facts." (Doc. 42, at 17). This language, according to Judge Roberts, incorporates into Attachment A all information contained in the affidavit. (*Id.*, at 16–17). Thus, the Application incorporates the language of Attachment A which, in turn, incorporates the language of the Application.

The Court finds the "aforementioned facts" language does not incorporate the content of the Application into Attachment A. To incorporate one document into another by reference, the incorporating document must contain "a clear and specific reference" to the document being incorporated. *Heitritter v. Callahan Const. Co.*, 670 N.W.2d 430 (Iowa Ct. App. 2003). In this case, the language is ambiguous, in that it could either be referring to those facts contained in the immediately preceding paragraph of the attachment or those facts contained in the affidavit. Based on the structure and headings of the application as a whole, it seems more likely that the "aforementioned facts" language was meant to incorporate only those facts in the immediately preceding paragraph. Specifically, it appears the Application is meant to describe the property to be seized,[3] while Attachment A is intended to be used to describe the facts establishing

_____

[3] The section on the first page of the application which is prefaced with "in Linn County, there is now certain property, namely:" is clearly intended to be used to describe the property to be seized, not to assert facts establishing probable cause or to summarize events. The following section, with pre-completed option to be check by the applicant as necessary, is meant to be used to describe to the issuing magistrate the grounds for seizing the property described in the first section. The very next paragraph states that "[t]he facts establishing the foregoing ground(s) for issuance of a search warrant are set forth in the Attachments which are made part of this Affidavit." These sections combine to indicate that the application itself is not intended to assert

the grounds for probable cause.[4]  Further, the language of Attachment A is ambiguous and is not a "clear and specific reference" to the fourth paragraph of the affidavit. Attachment A, therefore, does not incorporate the information contained in the Application by reference.

This finding is ultimately immaterial, however, because the Application plainly and unambiguously incorporates all information in the Attachments by declaring that the Attachments "are made part of this Affidavit." (Doc. 31-1, at 10).  The defendant's argument that it is unclear what facts within the Application Deputy Schmid was relying on in setting forth his grounds for probable cause is therefore misplaced.  The question is not whether the right information was included in the right place according to a strictly literal reading of the document's own terms.  Rather, the question is whether the Affidavit—consisting of the Application and Attachments combined—contains enough information in its totality to establish probable cause.  Probable cause here thus rests on two documents; one which alleges some facts but by its very nature relies on additional documentation and another which is supposed to include supporting information but in fact includes nothing sufficient to support probable cause.  To say that these documents "were not stellar examples of warrant writing" is an understatement.  (Doc. 42, at 34). As Judge Roberts pointed out, however, "[d]rafting imprecision does not necessarily rise to the level of a constitutional violation." (*Id.*, at 16–17).  It is also not lost on the Court

---

any facts supporting the seizure of property and that all facts to be relied upon by an issuing magistrate are to be included in the attachments.

[4] The structure of the first attachment further supports this conclusion.  The attachment begins with the affiant's identifying information including name, badge number, employer, duty assignment, and years of service.  The attachment makes no specific mention of or reference to the application document.  This information is followed by a brief paragraph which just restates some of the information at the top of the document.  The next paragraph begins with "[b]ased on the aforementioned facts. . .."  The only facts mentioned by that point in the document are details of the deputy's service.

that warrant applications are often hastily cobbled together under stressful conditions by officers who are not themselves attorneys and are doing their best to see justice done. This application was made in the early hours of the morning after a stressful standoff involving firearms and a physical struggle to subdue the suspect. The Court is not unsympathetic to the conditions under which Deputy Schmid authored this warrant application. It is out of consideration for precisely these conditions that the judiciary has held firm to the notion that "courts should not invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than commonsense, manner." *Gates*, 462 U.S. at 236 (internal citation and quotation omitted).

To ignore the language of the fourth paragraph of the affidavit because Deputy Schmid placed it under the wrong heading would be taking a hypertechnical rather than commonsense approach, especially when considering that the language is still within the four corners of the affidavit. The Court also agrees with Judge Roberts that the issuing judge read and considered the information contained in the affidavit because she signed and dated that portion. Thus, the entirety of the affidavit—that is, the application along with the attachments which are included by incorporation—can be used to assess probable cause.

### c. *Defendant's Second Argument*

Defendant next argues that even if the entirety of the affidavit and attachments can be considered, they are still insufficient to establish probable cause. (Doc. 43, at 3). Based on a reasonable interpretation of the information provided in the affidavit as a whole, the issuing judge knew that Deputy Steines saw defendant (1) with a long gun in his hands,[5] (2) throw the long gun into the trailer, and (3) toss another object into the

---

[5] The issuing judge is entitled to rely on the information contained within the four corners of the warrant application in making a probable cause determination. This Court's subsequent determination that Deputy Steines did not see a long gun in defendant's hand does not inform

trailer.  The issuing judge also knew that Deputy Schmid, the affiant, saw (1) a bottle with a leafy green substance in it that he believed to be marijuana, and (2) a bandolier with shotgun rounds on the chair outside the trailer.  The affidavit also asserts that defendant "was intoxicated at the time of the confrontation with" law enforcement.  (Doc. 31-1, at 16).

The government contends that these facts provide "two independent and sufficient grounds establishing probable cause for a search of the trailer: (1) the fact Defendant was intoxicated and [was in possession of a gun] and (2) officers seeing inside the trailer a 'bottle with a green leafy substance believed to be marijuana.'"  (Doc. 36, 13) (internal quotations omitted).  The Court finds that the affidavit contains sufficient facts for the issuing judge to find probable cause only as to the second ground.

The Court agrees with defendant that "the blanket statement that [defendant] was 'intoxicated,' without more, does not suffice to establish [that] he was, indeed, intoxicated."  (Doc. 43, at 3).  Not only would it "have been preferable for Deputy Schmid to explain how defendant's erratic and self-harming behavior supported the conclusion that defendant was intoxicated" (Doc. 42, at 17), it was fundamentally necessary for Deputy Schmid to include facts supporting his conclusion.  The conclusory statement that defendant was intoxicated, without any detail or observations as to how deputies reached that conclusion, cannot contribute to a finding of probable cause.  An "affidavit must provide the [issuing judge] with a substantial basis for determining the existence of probable cause" and "wholly conclusory statement[s] fail to meet this standard."  *United States v. Farlee*, 910 F.Supp.2d 1174, 1183 (D. S.D. 2012) (internal citations and quotations omitted) (second alteration in original).  Here, "there is nothing in the affidavit[ ] for the warrant[ ] from which the [issuing judge] could infer how [law

---

the question of whether the affidavit as submitted to the issuing judge contained sufficient information to establish probable cause.

Case 1:20-cr-00090-CJW-MAR   Document 57   Filed 03/12/21   Page 25 of 53

enforcement]" came to believe that defendant was intoxicated, "other than a terse and conclusory statement" that he was intoxicated. *Id.*, at 1185.

It is not necessary for law enforcement officers to prove defendant's intoxication, of course. It is enough that responding officers observe facts which cause them to *believe* that defendant was intoxicated. The facts upon which officers build their conclusions must be relayed to the issuing judge, however. Judge Roberts cites *United States v. Howard*, No. 04-3662, 2005 WL 1368039, at *2 (8th Cir. June 10, 2005) for the proposition that "the word of a citizen who is not trained in drug or alcohol detection" is sufficient to establish intoxication in a warrant application. (Doc. 42, at 18). That case is inapposite for several reasons. First, the issue raised in *Howard* was not whether a citizen's conclusion that a suspect was intoxicated was sufficient to establish probable cause by itself, but whether officers had a reasonable suspicion which "justified dispensing with the knock-and-announce requirement" when serving a valid warrant. *Id.* Second, the citizen who called 911 in *Howard* informed officers that the suspect appeared intoxicated, not that he was intoxicated. *Id.*, at *1. The citizen's belief was bolstered by the facts that the suspect was shouting obscenities and discharged a handgun in the courtyard of her apartment building—facts which she also relayed to responding officers. *Id.* Responding officers then obtained additional information from a neighbor who had observed the suspect run back to his apartment with a gun in his hand. *Id.* "The next day, they obtained a search warrant based on the information they obtained at the apartment building and records showing [the suspect] was a felon." *Id.* The issuing magistrate in *Howard* therefore had substantially more information to rely on to establish probable cause than a citizen's mere suspicion that the suspect was intoxicated.

As discussed above, Deputy Schmid personally observed ample detail to support his conclusion that defendant was intoxicated. Defendant had slurred speech, was thick tongued, his speech was disjointed, he was highly agitated, his behavior was erratic, and

there was a bottle of alcohol in plain view. If Deputy Schmid had included any of these facts in the affidavit, the issuing judge would have had *some* factual basis for believing that defendant was in fact intoxicated. Deputy Schmid failed to do so, however.

The issue of defendant's intoxication is critical because it is the only fact that makes his possession of a firearm illegal under state law. The application establishes that defendant held a long gun in his hand because Deputy Steines personally observed this fact. It is not illegal, however, to merely possess a long gun in the state of Iowa. That defendant possessed a long gun only supports the existence of probable cause when considered in tandem with his intoxication. The warrant application did not contain sufficient information to establish that defendant was intoxicated and therefore did not contain sufficient information to establish that defendant illegally possessed a long gun.

That the application contains such a dearth of information is especially unfortunate because, as noted above, Deputy Schmid had a wealth of information at his disposal. Aside from his observations about defendant's intoxicated state, he knew from personal observation that defendant had also possessed a handgun. Further, and perhaps most importantly, he knew from Deputy Omar's observation that defendant was not suspected of possessing a mere "long gun" as he described in the application, but a "sawed-off shotgun" the possession of which is nearly always illegal in the state of Iowa.[6]

In his objections, defendant focuses only on defendant's intoxication and does not object to or otherwise address Judge Roberts' finding that the observation of suspected marijuana established probable cause. (Doc. 42, at 19–20). Defendant does make a blanket objection to the probable cause finding, however, so the Court will treat that objection as referring to marijuana as well. In truth, the only fact in the affidavit which stands on its own as a fact supporting a finding of probable cause is Deputy Schmid's

---

[6] "A person shall not knowingly possess a short-barreled rifle or short-barreled shotgun in violation of federal law." Iowa Code Chapter 724.1C(2).

observation of the bottle purported to contain marijuana. Defendant initially asserted that nothing in the application indicates why Deputy Schmid believed it to be marijuana specifically as opposed to oregano or catnip, for example. (Doc. 31, at 10). Such certainty is not required for a finding of probable cause, however. *United States v. Williams*, 616 F.3d 760, 765 (8th Cir. 2010). An issuing judge "must permit officers to make commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 140 S.Ct. 1183, 1188 (2020) (quotations omitted). The probable cause standard does not require that officers "rule out the possibility of innocent conduct" before taking action to address what may reasonably be criminal activity. *Navarette v. California*, 572 U.S. 393, 403 (2014).

Here, the issuing judge knew Deputy Schmid personally observed a green leafy substance in a bottle in defendant's trailer. Many warrant applications go into great detail about an officer's training and experience, particularly when it comes to the identification of illicit drugs or the typical behavior of criminals. Indeed, at the suppression hearing on this matter, the government went to some length to establish that when officers see some evidence of drugs, they are likely to find more evidence of drugs upon further inspection. Such reasons undergirding an officer's suspicion are valuable but do nothing to shore up a finding of probable cause when they are only brought to light at the suppression hearing. The application and attachments at issue here do not go into such detail. The warrant application could have—and should have—contained significantly more information than it did. Given that Attachment A did indicate Deputy Schmid's decade of experience, however, it was not unreasonable for the issuing judge to credit his belief that the leafy green substance he observed was marijuana. The Court therefore finds that the warrant contained sufficient facts for the issuing judge to find probable cause. Defendant's objection on this ground is **overruled**.

## 2. Particularity

Judge Roberts found that the warrant was sufficiently particular to "allow officers to know the scope of a permissible search." (Doc. 42, at 22). Defendant objects to this conclusion, asserting that the search warrant did not specify the items to be seized and is therefore invalid. (Doc. 43, 4).

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." If a warrant itself lacks any one of these four requirements it is invalid, regardless of how much detail is contained in the application documents. *See United States v. Stefanek*, 179 F.3d 1030, 1033 (7th Cir. 1999) ("The Fourth Amendment requires that the *warrant* particularly describe the things to be seized, not the papers presented to the [issuing judge] (emphasis in original)). This requirement is intended not only to ensure that the issuing judge is in fact aware of the particularities of the search, but also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and *the limits of his power to search*. *Groh v. Ramirez*, 540 U.S. 551, 561 (2004) (emphasis added). The particulars of the application documents may be cross-referenced by the warrant, however, so long as "the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Id.*, at 557–58.

There are two dimensions to the particularity requirement. *See Dalia v. United States*, 441 U.S. 238, 255 (1979). First, the warrant must particularly describe the place, person, or thing to be searched. *See id.* at 255–57. Second, the warrant must particularly describe the evidence or items to be seized. *Id.*; a*ccord United States v. Grubbs*, 547 U.S. 90, 97 (2006) (stating that the Fourth Amendment "does not set forth some general 'particularity requirement.' It specifies only two matters that must be 'particularly

describ[ed]' in the warrant: 'the place to be searched' and 'the persons or things to be seized'" (alteration in original)). Thus, the standard is whether the warrant describes with particularity what is to be searched, which depends on the case and types of items involved. *See United States v. Horn*, 187 F.3d 781, 788 (8th Cir. 1999). An affidavit may provide the necessary particularity for a warrant if it is incorporated into the warrant, attached to the warrant, or present at the search. *Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987). "The particularity requirement 'is a standard of practical accuracy rather than a hypertechnical one.'" *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (quoting *United States v. Peters*, 92 F.3d 768, 769–70 (8th Cir. 1996)).

In *Groh*, the Supreme Court held that a search warrant was invalid when the warrant stated only a description of the house to be searched, did not contain a description of any items to be seized, and did not expressly incorporate the more detailed application document. *Id.*, at 554–55. "In other words, the warrant did not describe the items to be seized at all." *Id.*, at 558. Defendant argues that the warrant here is similar to the warrant at issue in *Groh*. (Doc. 43, at 4–5). Judge Roberts agreed that the warrant here is "somewhat analogous to *Groh*," but distinguishes it by pointing to the second page of the warrant which categorizes the information contained in the narrative paragraph as "[p]roperty, the possession of which is illegal," "[p]roperty used or possessed with the intent to be used as the means of committing a public offense or concealed to prevent an offense from being discovered," and "[p]roperty relevant and material as evidence in a criminal prosecution." (Doc. 42, at 21–22). This additional information "clearly shows that the warrant is seeking items of personal property which may be illegal." (*Id.*, at 21).

Unlike the warrant at issue in *Groh*, the warrant here is not "plainly invalid." The warrant here contains significantly more information than in *Groh*. In addition to a description of defendant's trailer and the address of where it could be found, the warrant

included a number of specific items which could reasonably be construed as objects of the search, albeit in narrative form. The specific mention of "a long gun" and "a bottle with a green leafy substance" inside, followed by the unambiguous assertion that these things constitute "[p]roperty, the possession of which is illegal," "[p]roperty used or possessed with the intent to be used as the means of committing a public offense or concealed to prevent an offense from being discovered," and "[p]roperty relevant and material as evidence in a criminal prosecution" is substantially more information than that contained in *Groh* and is sufficient to "assure[ ] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh*, 540 U.S. at 561.

This case is further distinguished from *Groh* in that the warrant in *Groh* would have been saved if the federal agent had expressly incorporated the application documents into the warrant and provided a copy of the warrant and application documents with the owner of the house. Here, the majority of the information contained in the application documents was necessarily incorporated into the warrant by dint of the fact that the narrative paragraph was apparently copied and pasted from the application. The language of the warrant itself, along with the affidavit identifying the crimes under investigation, defined and limited the scope of the search warrant. *See United States v. Stephen*, No. 18-CR-31-CJW, 2018 WL 4839065, at *12 (N.D. Iowa Oct. 4, 2018) ("The nature of the evidence being sought in this case, photographs and videos of naked children, dictates the scope of the search."). If the application documents themselves were sufficient to justify a warrant—as they were in *Groh* and as the Court has found here—then that same information is sufficient to meet the Constitutional particularity requirements for a valid warrant. Defendant's objection on this ground is therefore **overruled**.

Defendant's final objection regarding the search warrant is to Judge Roberts' recommendation that the Court deny defendant's motion to suppress evidence as a result

of an invalid warrant. The warrant application contained sufficient information to establish probable cause and the warrant itself contained sufficient particularity to apprise officers and defendant of the scope of the search. Accordingly, the search warrant was valid under the Fourth Amendment. For the reasons stated above, defendant's objection to Judge Roberts' recommendation is **overruled**.

### B. Leon *Good Faith Exception*

Judge Roberts found that even if the warrant fell afoul of the Fourth Amendment, evidence derived as a result of the warrant should not be suppressed because the officers executing the warrant could reasonably rely on the issuing judge's assessment of the application and warrant. (Doc. 42, at 25). Defendant objects to this conclusion and argues that "it was objectively unreasonable for the officers, especially the officer who drafted the warrant (Deputy Schmid), to rely on" a "facially deficient" warrant. (Doc. 43, at 5).

This Court has already concluded that the warrant was valid and properly executed. In the event the Court is mistaken in these findings, however, the Court agrees with Judge Roberts' analysis and conclusion that the *Leon* good faith exception applies here.

"Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). A "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (internal quotations and citations omitted) (alteration in original). There are four circumstances in which an officer's reliance on a warrant may be said to be objectively unreasonable: (1) when the affidavit

supporting the warrant contained a false statement included knowingly and intentionally or with reckless disregard for the truth, thus misleading the magistrate, (2) when the magistrate issuing the warrant "wholly abandoned his judicial role" in issuing the warrant, (3) "when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant", and (4) when the warrant is "so facially deficient" that no police officer could reasonably interpret the warrant as valid. *Puckett*, 466 F.3d at 630.

Defendant argues that the third and fourth circumstances apply in this case. (Doc. 31, at 13). "'Entirely unreasonable' is not a phrase often used by the Supreme Court." *United States v. Carpenter*, 341 F.3d 666 (8th Cir. 2003) (cautioning against the "dilution of the Court's particularly strong choice of words."). As discussed above, the touchstone for the existence of probable cause is "the mere probability" that a crime has been committed. *Winarseke*, 715 F.3d at 1067. Here, a well-trained officer reading the warrant prior to execution would likely have no doubt that the presence of a substance that another trained and experienced officer believe to be marijuana constituted probable cause to search the trailer. The Court has spared no feelings in its assessment of the warrant's shortcomings, but it simply cannot be said that it is *so* lacking in indicia of probable cause that a belief in the existence of probable cause would be entirely unreasonable. Indeed, given that the issuing state-court judge found probable cause and that Judge Roberts concluded this finding to be reasonable, the Court "would be hard pressed to conclude that it was entirely unreasonable" for Deputy Schmid to believe that his application and resulting warrant lacked probable cause. *Puckett*, 466 F.3d at 630.

Finally, the Court has already found that the warrant was not facially deficient. The language of the warrant describes both the location to be searched and items to be seized. Legal minds may differ about sufficiency and technicalities, but reasonable officers could rely upon an issuing judge's superior legal understanding to believe the

warrant was valid. Admittedly, the warrant leaves much to be desired, but it is not so facially deficient that no officer could reasonably interpret it as valid. Defendant's objection on this ground is **overruled**.

### C.     *Automobile Exception*

Judge Roberts found that even if the warrant was constitutionally deficient, the automobile exception to the warrant requirement would still apply and the search would not offend the Fourth Amendment. (Doc. 42, at 25–34). Defendant objects to this finding, arguing that defendant's trailer is not a "vehicle" for purposes of the automobile exception and that defendant has an enhanced expectation of privacy in the trailer compared with what he would have in a normal automobile. (Doc. 43, at 5–7).

Although this is a close call, the Court agrees with Judge Roberts that the automobile exception applies here. To conduct a warrantless search under the automobile exception, the only requirement is that law enforcement officers must have probable cause to believe that the vehicle contains contraband or other evidence of criminal activity. *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996). Based on the facts established above, officers on the scene unquestionably had probable cause to believe evidence of criminal activity would be found in defendant's trailer. The question defendant asks this Court to answer is whether defendant's trailer falls outside of the automobile exception. The Court concludes that it does not.

The automobile exception to the warrant requirement has a long provenance in our caselaw. The exception was originally justified by the "practical challenges of obtaining a warrant for a vehicle that could be 'quickly moved' out of the jurisdiction." *United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (quoting *Carroll v. United States*, 267 U.S. 132, 153 (1925)). "This is strikingly true where the automobile's owner is alerted to police intentions and, as a consequence, the motivation to remove the evidence from official grasp is heightened." *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974). The

"ready mobility" of an automobile which justifies dispensing with the warrant requirement refers not merely to the immediacy with which a vehicle may be moved, but to the possibility that it could be moved at all—what the Court calls "inherent mobility." Accordingly, a vehicle may be searched without the need of a warrant even if the owner is in custody, *United States v. Castaneda*, 438 F.3d 891, 893–94 (9th Cir. 2006), if the vehicle is secured in a police impound lot, *Michigan v. Thomas*, 458 U.S. 259, 261 (1982), or if the vehicle is stuck in a ditch. *United States v. Maggard*, No. 00-1146, 2000 WL 680394, at *1 (8th Cir. May 26, 2000). On the other hand, the exception does not apply to automobiles that are not being used as vehicles. *See, e.g.*, *United States v. O'Connell*, 408 F.Supp.2d 712, 722–23 (N.D. Iowa 2005) (finding automobile exception inapplicable to search of badly damaged vehicle with flat front tires parked in yard and surrounded by tall grass). The "inherent mobility" of a vehicle therefore creates "a conclusive presumption of exigency" in most vehicles which vitiates the otherwise ironclad strictures of the Fourth Amendment. *California v. Carney*, 471 U.S. 386, 404 (1985) (Stevens, J., dissenting).

The expansion of the theoretical underpinnings of the Fourth Amendment itself—the vindication of not only property interests but also a person's reasonable expectation of privacy, *see Katz v. United States*, 389 U.S 347 (1967)—led to a concomitant expansion of the rationale for the automobile exception. *Cardwell*, 417 U.S. at 590. "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects." *Id.* In other words, the expectation of privacy that a person enjoys in their automobile is significantly less than that enjoyed in their home.

Courts initially rationalized the diminished level of privacy a person could expect in their vehicle by pointing to the "relative openness of a car's passenger compartment." *Blaylock*, 535 F.3d at 926. After all, "[w]hat a person knowingly exposes to the

public . . . is not a subject of Fourth Amendment protection." *Cardwell*, 417 U.S., at 591 (quoting *Katz*, 389 U.S., at 351). This proposition applies even to articles which travelers go to some length to protect from public scrutiny. Departing from the logic that items in an easily observable passenger compartment are afforded less constitutional solicitude, the Supreme Court has extended the automobile exception to allow warrantless searches of locked glove boxes, *Chambers v. Maroney*, 399 U.S. 42, 44 (1970), and completely enclosed trunks. *Cady v. Dombrowski*, 413 U.S. 433, 446 (1973). This extension of the automobile exception to cover otherwise unobservable spaces of a vehicle is justified not by what a person chooses to expose to the public, but rather by "the pervasive regulation of vehicles capable of traveling on the public highways." *Carney*, 471 U.S., at 392.

> Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.

*South Dakota v. Opperman*, 428 U.S. 364, 368 (1976).

"In announcing each of these two justifications [inherent mobility and pervasive regulation], the Court took care to emphasize that the rationales applied only to automobiles and not to houses, and therefore supported 'treating automobiles differently from houses' as a constitutional matter." *Collins v. Virginia*, 138 S.Ct. 1663, 1671 (2018) (quoting *Cady*, 413 U.S., at 441). The caselaw makes clear that the constitutional deference afforded to traditional dwellings is not extended to vehicles that occupy a middle ground between dwelling and vehicle. Despite the fact that a "citizen has a much greater expectation of privacy concerning the interior of a mobile home than a piece of luggage such as a footlocker," *Carney*, 471 U.S., at 405 (Stevens, J., dissenting), under

36

our current understanding of the Fourth Amendment, whatever heightened degree of privacy a person could subjectively expect in a camper or a mobile home is subverted by the fact that the vehicle is capable of travelling on public highways and is subject to regulation—and ostensibly greater scrutiny—by the state. *Id.*, at 392–93.

In short, warrantless searches of vehicles are constitutionally acceptable due to the combination of an automobile's inherent mobility and the enhanced police powers that the state exercises over vehicles which, in turn, diminish a person's expectation of privacy in the vehicle. When it comes to vehicles, therefore, the only aspect of the Fourth Amendment that survives *Carroll* and its many progeny is the requirement that officers possess probable cause to believe contraband will be discovered somewhere in the vehicle.

The automobile exception was developed out of a need to adapt our understanding of the law to new technologies. The automobile age initially presented unique challenges to law enforcement that had not been encountered to that point. These challenges only became more pronounced and multifarious with time. The rapid proliferation of automobiles and the steady rise in crime—particularly drug-related crime—in the second half of the twentieth century seemed to justify the expansion of the automobile exception. On the other hand, even as courts have expanded the exception, they have been less inclined to account for other trends and changes in technology that might mitigate the perceived need for the exception.

The instant case throws the tensions between modern technologies and societal trends and the traditional justifications for the automobile exception into stark relief. With the advent and integration of cellular communication, wireless internet, mobile tablets, and high quality digital photography, the "severe" and sometimes "impossible burden" of maintaining "the people and equipment necessary to transport impounded automobiles to some central location until a warrant could be secured" that officers once

faced no longer exists. *Arkansas v. Sanders*, 442 U.S. 753, 765 n.14 (1979) (abrogated on other grounds by *California v. Acevedo*, 500 U.S. 565 (1982)). This is not to say that the exigency that justified an immediate search of an automobile in 1925 could never exist today. Police organizations throughout the country have different capabilities and a Fourth Amendment inquiry should remain a case-by-case, fact-intensive affair. The capabilities of modern police forces and the realities of the modern living conditions of many Americans are vastly different than they were in the Seventies, however, and should be considered when applying the automobile exception.

The Court undertook this brief explication of the history and purpose of the automobile exception because defendant's circumstances here present a close case in terms of the legal philosophy governing its application. Defendant draws the Court's attention to the primarily residential nature of defendant's trailer and argues that it was not readily mobile. (Doc. 43, at 6). Defendant points to the fact that the trailer itself is not motorized and was not attached to a towing vehicle, the trailer tires were chocked, the tongue was up on blocks, and that he had solar panels set up outside and attached to the trailer. *Id.* The trailer was also filled with evidence supporting defendant's claim that he was using it as a residence. (Doc. 31-1, at 1–8). The trailer was equipped with curtains, a bed, bookshelves, a small pantry, and cooking area. *Id.* The shelves were filled with books, movies, notebooks, toiletries, food, and cooking utensils. *Id.* This trailer was no mere mechanism of transportation.

There are some parallels to *Carney* here, however. In *Carney*, the Supreme Court held that a vehicle being used on a public highway—or readily capable of being so used—and parked in a public place not regularly used for residential purposes was subject to the automobile exception and may be searched on the basis of probable cause alone. *Carney*, 471 U.S., at 392–93. The vehicle at issue in *Carney* was a motorhome parked in a public parking lot. *Id.*, at 388. The motor home was capable of driving under its own power,

Case 1:20-cr-00090-CJW-MAR   Document 57   Filed 03/12/21   Page 38 of 53

but also possessed "some, if not many of the attributes of a home." *Id.*, at 393. Here, the trailer was licensed to be used on public roadways, was parked on a public street, and likewise bears many characteristics of a home. The vehicle at issue here was incapable of being driven by itself and in fact was not intended to be used as a vehicle at all. Defendant's pickup truck was parked just ahead of the trailer, indicating that the pickup was defendant's actual vehicle, without which the trailer could not move.

These distinctions highlight the curious factual scenarios which necessitate a deeper examination of the justifications for exceptions to the warrant requirement, but they do not distinguish *this* case to an extent that would put the trailer outside the traditional ambit of the automobile exception. Although not capable of moving under its own power, defendant's trailer was inherently mobile. It was parked on a public road with its own mechanism of locomotion—defendant's pickup—near at hand. Defendant brought the trailer there for the necessarily temporary purpose of helping his father clear trees after a major storm, indicating that he intended to leave in the near term. The process of loading up the solar panels, locking the door, attaching the trailer to the truck's hitch, and pulling the chocks would take only a few minutes, at most. Although not quite so simple as a "turn of an ignition key," *Carney*, 471 U.S., at 393, it is also a far cry from being stuck in a ditch or impounded, circumstances which have not previously precluded vehicles from being considered inherently mobile. The essence of the holding in *Carney* is whether the vehicle in question is in use as a "movable vessel," as opposed to a fixed residence. *Id.*, at 392. Under different factual circumstances, an objective observer may very well conclude that the trailer was primarily residential and therefore not subject to the automobile exception. Given the facts present here, however, the trailer is more characteristic of an automobile than a residence.

The inherent mobility of automobiles—and the exigency such mobility presents— is not the only justification for the exception. As discussed above, the government's

39

extensive regulation of automobiles diminishes a person's expectation of privacy in automobiles, making probable cause the only requirement necessary for a search to be deemed reasonable under the Fourth Amendment. This justification is not *carte blanche* to search any vehicle upon probable cause, however. Law enforcement may not conduct a warrantless search of an automobile in a person's driveway, for example, even when armed with probable cause. *Collins v. Virginia*, 138 S.Ct. 1663, (2018).

The Supreme Court explicitly described the controversy in *Collins* as being rooted in the tension between the automobile exception and Fourth Amendment protections afforded to the curtilage of a person's home, but in doing so emphasized several key principles that are instructive here. First, that "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" is the "very core" of the Fourth Amendment. *Id.*, at 1671 (internal quotations and citations omitted). Second, what the Court considers to be "part of the home itself" has been expanded to include things other than the physical structure of the home—in this case the curtilage—"to give full practical effect" to the core right of the Fourth Amendment. *Id.* Third, that the automobile exception, like other exceptions to the warrant requirement, must be limited in scope to protect the "distinct privacy interest in one's home." *Id.*, at 1672. These principles seem to contradict the rationale undergirding the application of the automobile exception in cases such as this.

The question left as yet unanswered by *Carroll*, *Coolidge*, *Carney*, and now *Collins* is what is required for something to be a home? A house is certainly a home. One need not even own the house for the Fourth Amendment to protect it as that person's home. *Chapman v. United States*, 365 U.S. 610 (recognizing Fourth Amendment protections for tenants). A hotel room has long been considered a home for Fourth Amendment purposes. *Lustig v. United States*, 338 U.S. 74 (1819); *Stoner v. California*, 376 U.S. 483 (1964). Even a camping tent has been considered a home, although not in

40

this Circuit. *United States v. Gooch*, 6 F.3d 673 (9th Cir. 1993). The rationale which continues to distinguish automobiles from other places that are afforded Fourth Amendment protections is that the government regulates automobiles to a degree which vitiates any expectation of privacy. No such inquiry is made in other Fourth Amendment contexts, however. Indeed, the usual inquiry is whether the person has a subjective expectation of privacy and whether that expectation is objectively reasonable. *See, e.g.*, *Gooch*, 6 F.3d, at 676 (citing *Katz*, 389 U.S., at 361). The imposition of government regulations on locations such as motel rooms or public camping grounds has not been found to override a person's expectation of privacy in those places. This Court is unable to square these holdings with the unique regulatory justification of the automobile exception. The Fourth Amendment "protects people, not places," *Katz,* 389 U.S., at 351, and prior cases make clear that the expectation of privacy a person has in the place they are unequivocally using as their home—be it a rented house, a hotel room, or a tent—is reasonable without regard to the extent of government regulation of that place. The *Katz* holding itself established that a person may have a reasonable expectation of privacy in a telephone conversation held in a public phone booth, despite the overwhelming amount of regulation in the field of interstate communication. "What a person seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* When a person's home has wheels attached, governmental regulation leaps to the fore of the analysis. Such a person's home—far from being the "first among equals," *Florida v. Jardines*, 569 U.S. 1, 6 (2013)—takes a backseat even to public telephone booths.

There is also some discordance between the government's invocation of the automobile exception and the actions of the deputies on the ground that morning. Deputies first encountered defendant just before 1:00 AM on the morning of August 17, 2020. Gov't Ex. 5, at 0:20. A little more than one hour later, defendant was placed in

an ambulance and deputies began processing the scene around defendant's trailer. Gov't Ex. 5, at 26:30. The record does not reflect precisely when Deputy Schmid completed and submitted the warrant application, or how he communicated with the issuing judge, but the warrant was returned as executed at 5:13 AM that same morning. (Doc. 31-1, at 18). This means that fewer than four hours elapsed from the time deputies began processing the scene to the time the warrant was executed. The inherent mobility of the trailer was clearly not so exigent that deputies could not wait a few hours for a warrant. It seems incongruous for the government to attempt to defend a search using an exception to the warrant requirement that is predicated in part on the presumption that "the opportunity to search is fleeting," *Chambers*, 399 U.S., at 51, when the officers conducting the search determined that the opportunity was not, in fact, fleeting and actually obtained a warrant. To avail oneself of an exception to the warrant requirement when one has already obtained a warrant—essentially to assert that it does not matter how sloppy or incomplete the warrant is because one was not necessary to begin with—is counterintuitive at best.

Exceptions to the warrant requirement should not be used to save a deficient warrant after the fact. The search incident to arrest exception, for example, has long been understood to be strictly cabined by the circumstances justifying its use. "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not a search incident to arrest." *Preston v. United States*, 376 U.S. 364, 367 (1964). "[T]he reasons that have been thought to justify warrantless searches carried out in connection with an arrest no longer obtain when the accused is safely in custody at the station house." *Chambers*, 399 U.S., at 47. The automobile exception should be understood as a justification for *warrantless* search, not a post hoc remedy for a deficient warrant. In the context of automobiles "an *immediate* intrusion is necessary," *United States v. Ross*, 456 U.S. 798, 806 (1982) (emphasis added), because "rigorous

42

enforcement of the warrant requirement is impossible." *Opperman*, 428 U.S., at 367. In circumstances such as those present here an immediate intrusion is clearly not necessary, not because the officers had ample time to obtain a warrant, but because they actually did obtain a warrant. *See United States v. Howard*, 489 F.3d 484, 495 (2d Cir. 2007) (rejecting notion that failure to procure a warrant despite passage of time renders automobile search impermissible). Despite numerous admonitions that exceptions to the warrant requirement should be "well-delineated" and "jealously and carefully drawn," *e.g.*, *Coolidge*, 403 U.S., at 455, and applied only in "carefully defined" circumstances, *Camara v. Mun. Court of City and Cnty. of San Francisco*, 387 U.S. 523, 528–29 (1967), the automobile exception has been expanded to the point where the exception very nearly swallows the rule.

For the reasons stated above, the Court has serious misgivings about applying the automobile exception in this case. Absent controlling precedent on this issue, the Court would not apply the automobile exception to defendant's trailer here. Nor would the Court allow the government to use the automobile exception as a failsafe where law enforcement obtained a warrant that is later found to be deficient. Nevertheless, the Court is bound by controlling precedent. The Eighth Circuit Court of Appeals has plainly held that the automobile exception may be applied to justify a search when the warrant for that search is later found to be deficient. *United States v. Holleman*, 743 F.3d 1152, 1158 (8th Cir. 2014). "[A]ny infirmities in the search warrant application are irrelevant so long as the search of the vehicle fell within the automobile exception to the search warrant requirement." *Id.* Here, defendant's trailer was readily mobile, licensed to travel on public roads, and parked on a public street. Judge Roberts did not err in finding that the automobile exception applies to defendant's trailer. Defendant's objection on this ground is **overruled**.

### D. Deputies' Authority to Enter the Trailer

The Court has already upheld Judge Roberts' findings that the automobile exception applies to defendant's trailer and that Deputy Schmid's observation of the pill bottle containing apparent marijuana was sufficient to justify entry into the trailer. In the event that he was wrong about those findings, Judge Roberts alternatively found that Deputy Omar had authority to enter defendant's trailer to blow out the burning candle under either of two other theories. First, that Deputy Omar obtained consent from James Maccani, who had actual authority to give such consent. (Doc. 42, at 39–45). Second, that Deputy Omar's entry was justified by the community caretaking exception. (*Id.*, at 45–46). Defendant objects to each of these findings. (Doc. 43, at 7–8).

#### 1. Third Party Consent

One exception to the presumption that a warrantless search is unreasonable is when the holder of the right consents to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In fact, law enforcement need not even possess probable cause to conduct a search if they have the consent of the subject of the search. *Id.* Consent for a search may be obtained from a third party if "the facts available to the officer at the moment . . .warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (citation omitted). Here, the government argued that Deputy Omar received consent from James, defendant's father, to enter the trailer to blow out the candle. Judge Roberts found that this consent was sufficient to authorize Deputy Omar to enter the trailer because defendant left the trailer in James' care and specifically directed James to secure the trailer. (Doc. 42, at 41). Defendant argues that the authority extended to James by defendant did not amount to the "common authority" required for James to grant such access to enter. (Docs. 31, at 5; 43, at 7–8).

Defendant cites *United States v. Almeida-Perez*, 549 F.3d 1162 (8th Cir. 2008), to support the argument that James lacked the privileges commensurate with an occupant or possessor of the trailer to give consent. (Doc. 31, at 5). The government counters by citing *United States v. Weston*, 443 F.3d 661 (8th Cir. 2006), and argues that Deputy Omar's entry into the trailer was reasonable because he reasonably believed that James possessed the authority to consent to the entry. (Doc. 38, at 10–12).

The record makes clear that defendant left the trailer in the control of his father. Defendant was explicit in his concern about someone stealing his belongings, but he also instructed his father to "secure my trailer" and directed James to where he could find the keys to effectuate that instruction. Defendant urges the Court to adopt an extremely narrow understanding of what defendant meant by "secure," one which would allow for defendant to be concerned about the theft of his property but completely sanguine about its potential incineration.

This is an unreasonable understanding of defendant's instruction to James. A more reasonable interpretation is that defendant granted James the authority to do everything necessary to protect his property in the trailer, including unplugging and stowing the solar panels, entering the trailer to put away defendant's chair and cooler, and even moving the trailer if necessary to prevent defendant from incurring a parking citation, for example. This rationally includes granting permission to another party to perform those same tasks in the event James was physically incapable of performing them himself. The Court is unwilling to parse "the metaphysical subtleties" that may be present in defendant's statement to secure his trailer. *Frazier v. Cupp*, 394 U.S. 731, 740 (1969). A common-sense interpretation of a person's statements is generally the most accurate interpretation and the Court sees no reason to believe otherwise here.

Given defendant's broad grant of authority to James—which the deputies were present to hear—it was reasonable for Deputy Omar to believe that James had sufficient

45

authority over the trailer to consent to Deputy Omar's entry. Defendant's objection on this ground is **overruled**.

### 2. *Community Caretaking Exception*

This case is distinguishable from the cases cited above in that Deputy Omar's entry was not investigative in nature. This was not a search in the sense that Deputy Omar's entry was for the purpose of discovering incriminating evidence. The intrusions into the defendant's privacy that required some form of consent in *Weston* and *Almeida-Perez* were undertaken specifically in pursuit of criminal investigations. To be sure, the core right protected by the Fourth Amendment is a person's right to be free from governmental intrusion in general and is not limited to only those intrusions intended to discover evidence. Under certain circumstances, limited intrusions are justified for officers to fulfill their roles "as so-called community caretakers." *United States v. Quezada*, 448 F.3d 1005, 1007, (2007). Such intrusions are justified when they "are undertaken to help those in danger and to protect property" and "are unrelated to the officer's duty to investigate and uncover criminal activity." *Id.*

The nature of Deputy Omar's intrusion here was not as an officer of the law enforcing the criminal code. Rather, it was as a public servant responding to a dangerous circumstance. Indeed, while Deputy Omar was inside the trailer, Deputy Schmid was already confirming details with other deputies in the completion of the warrant application. The fact that a warrant to conduct a full search was anticipated by deputies at the scene indicates strongly that Deputy Omar's only purpose was to prevent damage that may have occurred from the burning candle. A trailer fire on a public road would not only have destroyed defendant's property but would have also presented an

unacceptable danger to the public at a time when local emergency resources were already stretched thin.[7]

Defendant argued that deputies should have required James or a neighbor who was also present to blow the out candle. (Docs. 31, at 6; 43, at 8). Law enforcement officers are under no obligation to exhaust all less-intrusive means before performing their community caretaking role. The question to be asked in circumstances such as this is not whether more reasonable alternatives were available to deputies, but whether the actions deputies did take were objectively reasonable under the circumstances. Given James' physical condition it was reasonable for Deputy Omar to believe that the safest and most expedient method of addressing the danger posed by the burning candle was to enter defendant's trailer himself. Defendant's objection on this ground is **overruled**.

### E. *Plain View Exception*

Judge Roberts found that once Deputy Omar was inside defendant's trailer to blow out the burning candle—under either the third-party consent or community caretaking doctrines—the observation of the shotgun fell under the plain view exception to the warrant requirement and should not be suppressed. (Doc. 42, at 37–39). Defendant objects to this finding, arguing that the incriminating character of the shotgun was not immediately apparent. (Doc. 43, at 7). Defendant's argument is predicated on the assumption that Deputy Omar needed to know with a legal certainty that the shotgun was shorter than legally permissible for it to fall under the plain view exception. (Doc. 39, at 7). Judge Roberts correctly found that this is not the standard applicable to the plain view analysis. (Doc. 43, 37–38).

---

[7] Deputies arrested defendant one week after Cedar Rapids was struck by a particularly powerful "derecho" storm, characterized as "the most costly thunderstorm disaster in U.S. history. Bob Henson, *Iowa derecho in August was most costly thunderstorm disaster in U.S. history*, WASH. POST (Oct. 17, 2020, 8:04 AM) https://www.washingtonpost.com/weather/ 2020/10/17/iowa-derecho-damage-cost/.

As an initial matter, the plain view exception cannot apply when the officer does not have a right to be in a position to observe contraband in plain view. "[A]ny evidence seized by the police will be in plain view, at least at the moment of seizure," as the natural consequence of any search. *Coolidge*, 403 U.S., at 465. The first question is therefore whether the circumstances that led to the item coming into plain view violated defendant's Fourth Amendment rights. *See id.* For the two reasons stated above, Deputy Omar had a legal right to be in a position to observe the shotgun lying on defendant's bunk. The second requirement of the plain view exception is that the officer who discovers the incriminating evidence must do so inadvertently, meaning that the officer must not "know in advance the location of the evidence and intend to seize it." *Id.*, at 470. Here, Deputy Omar entered the trailer with the intent to extinguish the candle, not seize evidence. Deputy Omar arrived at the scene later than the other deputies, so it is unclear whether he knew that the shotgun would be inside. The fact he did not actually seize the shotgun when he first observed it, however, is strong evidence that his entry was not merely a ruse to obfuscate an otherwise unlawful search.

The third requirement of the plain view analysis—the requirement challenged by defendant—is whether the incriminating nature of the item seized was immediately apparent. *Id.*, at 467. This requirement does not mean, however, that the officer who sees the item must be certain that the item is contraband or otherwise illegal. *Texas v. Brown*, 460 U.S. 730, 741–42 (1983). Neither a "near certainty" nor a "high degree of certainty . . . is necessary for an application of the plain view doctrine." *Id.*, at 741. Rather, the incriminating nature of an item in plain view is immediately apparent when "there is probable cause to associate that property with criminal activity." *Id.*, at 741–42. Applying this "flexible, commonsense standard" to the facts here, the Court finds that the incriminating nature of the shotgun observed in plain view by Deputy Omar was immediately apparent. Although Deputy Omar did not know the precise length of the

48

barrel or the overall length of the shotgun—and could not therefore definitively determine that the shotgun was illegally modified—Deputy Omar did observe that the stock had been "sawed off and the barrel was very shortened" (Doc. 47, at 104–105) and that the shotgun "was significantly shorter than a normal shotgun would be." (*Id.*, at 119). The video footage in evidence corroborates Deputy Omar's testimony about his initial impression of the shotgun. After being in the trailer for less than a minute, Deputy Omar emerged from the trailer and immediately stated, "There's a sawed-off shotgun and a .22 rifle laying on the bed." (Gov't Ex. 4, at 1:35). Deputy Omar's initial reaction to the shotgun coupled with the facts he articulated at the suppression hearing establish that the incriminating nature of the shotgun was immediately apparent and that its seizure was justified under the plain view exception. The defendant's objection on this ground is **overruled.**

>    F.    *Inevitable Discovery*

Judge Roberts found that if Deputy Omar's entry into the trailer was not justified under the community caretaking or third-party consent doctrines, the deputies would have discovered the shotgun when they later executed the valid warrant, thus ameliorating Deputy Omar's constitutional violation. (Doc. 42, at 46–48). Defendant objects to this conclusion and argues that the warrant cannot excuse Deputy Omar's illegal entry because the warrant was not actually valid. (Doc. 43, 8–9). Defendant further argues that the inevitable discovery doctrine does not apply because the deputies were not pursuing an alternative line of investigation as required to invoke the inevitable discovery exception. (*Id.*).

The inevitable discovery doctrine allows for the admission of "evidence obtained as a direct result of an illegal search" when such evidence "ultimately or inevitably would have been discovered by lawful means." *Hogan v. Kelley*, 826 F.3d 1025, 1028 (8th Cir. 2016) (citations omitted). For the inevitable discovery exception to apply, "the

49

government must prove by a preponderance that there was a reasonable probability that the evidence would have been discovered by lawful means" even without the constitutional violation and "that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* "In this analysis, 'it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful [entry] not occurred.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th 2012) (quoting *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1020 (8th Cir. 2003)).

As already discussed, the warrant here was valid. At a minimum, it established probable cause that evidence of drug possession or drug use would be found inside the trailer. In executing the warrant deputies were authorized to search every area of the trailer which could have contained illegal drug or paraphernalia. Areas covered by the warrant certainly included the top of defendant's bunk where the shotgun was located.

Defendant argues that the deputies would likely not have sought a search warrant absent the discovery of the shotgun. (Doc. 43, at 9). This argument has some merit. Defendant argues that both Deputy Steines and Deputy Omar testified at the suppression hearing that the decision to obtain a search warrant was not made until after Deputy Omar discovered the shotgun. (*Id.*). Deputy Steines testified that the deputies discussed whether they should seek a warrant after Deputy Omar observed the shotgun and that he believed defendant had an expectation of privacy in the trailer. (Doc. 47, at 83). Deputy Omar testified that deputies decided to obtain a warrant "[a]t some point" after he observed the shotgun. Defendant interprets this testimony as meaning that the deputies decided to seek a warrant because of Deputy Omar's discovery of the shotgun. This is a plausible interpretation, but it is not the only interpretation. Another plausible interpretation is that deputies made the decision to obtain a warrant based on the evidence

they had already observed, and that decision simply happened to occur after Deputy Omar's incidental discovery of the shotgun. Each of the deputies' testimony relate only to the temporal relationship between the discovery of the shotgun and the decision to seek a warrant. Neither of the deputies' testimony describes a causal relationship. On the other hand, Deputy Schmid testified that he would have sought a warrant regardless of whether Deputy Omar had discovered the shotgun. (*Id.*, 30–31). Defendant stated unequivocally that he was in possession of a shotgun and they had not been able to confirm defendant's claim. Absent Deputy Omar's incidental discovery while extinguishing the candle, deputies would not have "located [the shotgun] prior to executing the search warrant. [Defendant] never exited the trailer with it. And so [deputies] believed that it was still in the trailer." (*Id.*, at 31).

Deputy Schmid also testified that the presence of controlled substances informed his decision to seek a warrant. In fact, all three deputies testified that the observation of some drugs indicates the presence of evidence of more drugs or drug activity. (*Id.*, at 26). Deputy Schmid further testified that the presence of both firearms and drugs "elevated the need to get a search warrant." (*Id.*, at 31). The presence of one firearm and potential for the presence of another justified further investigation by deputies. Separately, the presence of illegal drugs independently justified further investigation. Contrary to defendant's claim, there is nothing in evidence proving that deputies only decided to obtain a warrant because of the discovery of the shotgun. In fact, deputies were actively collecting and cataloging items of evidence. It is clear that they were pursuing an investigation related to defendant's possession of firearms and drugs prior to Deputy Omar entering the trailer and were not simply going to secure the trailer and leave the scene.

The warrant was valid, and the subsequent execution of the warrant was lawful. Alternatively, the deputies' search of the trailer was justified under the automobile

exception. In their search of defendant's trailer in pursuit of evidence of narcotics or evidence of other firearms, deputies would have inevitably discovered the shotgun on the bunk. Based on the information known to deputies at the time and on their testimony, it is more than "reasonably likely" that they would have searched defendant's trailer, either under the valid warrant or under the automobile exception. It simply cannot be said that the deputies would not have searched the trailer and discovered the shotgun but for Deputy Omar's entry. The defendant's objection on this ground is **overruled**.

### G.    *Fruit of the Poisonous Tree*

Defendant's final substantive objection is to Judge Roberts' finding that the warrant, the shotgun, and the ammunition discovered at the scene are not fruits of a poisonous tree and should not be suppressed. (Doc. 42, at 48). Judge Roberts made this finding in response to a "cursory argument" advanced by defendant in his original suppression brief and essentially based this finding on all of his prior findings without addressing any of them in detail. (*Id.*). Defendant's objection is not particularly specific, but reiterates the prior arguments made in his initial and supplemental brief.

The original argument is not so much an argument in its own right as it is a conclusion following his prior arguments about Deputy Omar's entry into his trailer being illegal and summarizing why defendant believes the shotgun and ammunition should be excluded. Therefore, the Court responds to defendant's objection by reiterating the conclusions already made. The warrant was validly issued and executed, the search of the trailer was lawful under either the search warrant or automobile exception, Deputy Omar's entry into defendant's trailer was justified under either the third party consent or community caretaking doctrines, and officers would have inevitably discovered the shotgun during the search under the warrant or automobile exception. The shotgun and ammunition found inside the trailer are therefore not fruits of any conceivable poisonous tree. Defendant's objection on this ground is **overruled**.

## V. CONCLUSION

Defendant's last objection is to Judge Roberts' ultimate recommendation, that defendant's motion be denied. For the reasons stated above, this objection is **overruled**. Defendant's objection No. 1 is **sustained in part and overruled in part**, and objections Nos. 3–11 are **overruled**. (Doc. 43). The Court **adopts with factual modifications** Judge Roberts' Report and Recommendation (Doc. 42) and **denies** defendant's Motion to Suppress (Doc. 30).

**IT IS SO ORDERED** this 12th day of March, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa